509 P.2d 871

STATE of New Mexico, Plaintiff-Appellee,

v.

Beatrice GARDNER, Defendant-Appellant.

No. 9390.

Supreme Court of New Mexico.

March 23, 1973.

Rehearing Denied May 25, 1973.

David F. Boyd, Jr., Albuquerque, for appellant.

David L. Norvell, Atty. Gen., Ronald Van Amberg, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

CAMPOS, District Judge.

The defendant at trial, appellant here, was charged by indictment with the crime of murder. She was accused of murdering her husband Neal Gardner. She went to trial on a plea of not guilty by reason of insanity. The jury returned a verdict of guilty of first degree murder. She has appealed here. We affirm.

The facts preceding and surrounding the homicide are relatively simple and clear. There are no significant contradictions in any of these.

About 1:00 p. m. the day of the homicide appellant purchased a 357 Magnum pistol at the Seven Idols Gun Shop in Albuquerque. At the same time and at the same place she purchased ammunition for the 357. To the sales clerk at the gun shop appellant appeared to be a "very nice lady" who never said anything, only that "she had prowlers like everybody else has."

The day before the homicide appellant and her husband had experienced domestic difficulty. He had moved to the apartment of a friend Larry Luchi.

After the purchase of the pistol appellant went to the Luchi apartment, where, at about 6:30 in the evening, she, her husband and Luchi were joined by Mary Marrow. At the time Mary Marrow arrived at the apartment things appeared calm. Appellant was sitting on the couch watching television. Neal Gardner and Larry Luchi were, or had been, drinking. Mary Marrow washed some dishes then joined the others in the living room to watch television. She had been sitting in the living room about ten minutes when she heard Neal Gardner mention to appellant something about leaving and getting a divorce. Appellant was heard to remark, "then you are going to leave me." To this Neal Gardner responded, "Yes." A shot was heard. Mary Marrow looked up and saw appellant standing over her husband holding a pistol. He was lying on the couch. Mary Marrow then heard and saw appellant fire another shot.

Other than the brief conversation overheard immediately before the shooting, Mary Marrow heard no arguments nor did she observe any fighting, striking or any other forms of violence in the living room that evening.

Appellant remained at the apartment until the police came to investigate. One of the officers, upon walking in the apartment, observed a kitchen knife drop onto the floor from the person of appellant. The knife had a blade approximately six inches long. It appeared to have been tucked in the back of appellant's pants. It was admitted at the trial that appellant shot and killed her husband. Appellant admitted to police that the gun used in the slaying was the 357 Magnum she had purchased earlier the day of the incident.

The State's case was presented through the testimony of ten witnesses. These included Mary Marrow, the sales clerk at the gun shop, the owner of the apartment where the slaying occurred, and seven officers of the Albuquerque Police Department who participated in the investigation of the homicide.

The only witnesses called by the defense were two psychiatrists licensed to practice their profession in this State. Both psychiatrists at trial expressed professional opinions that appellant was suffering from a disease of the mind and, due to this, unable to control her impulse to shoot her husband. More on the psychiatric opinions later.

Appellant relies on five points for reversal.

MENTAL COMPETENCY TO STAND TRIAL: It is contended that the trial court erred in failing to make an independent determination as to appellant's mental competency to stand trial. Section 41–13–3.1, N.M.S.A., 1953 Comp. (2d Repl. Vol. 6, 1972), requires that

> "Whenever it appears, by motion or upon the court's own motion, * * * that there is a question as to the mental competency of a defendant to stand trial, * * * *"

then the court must determine the issue.

Although not being quite specific about it, appellant's thrust is apparently directed, timewise, to the day of trial June 23, 1971. We deduce this from the fact that the court on its own motion on May 28, 1971, ordered a hearing set for June 14, 1971, to determine this very issue. An order in the case reflects that the court conducted a hearing on the latter date and the court, relying on the report of one of the psychiatrists who testified at trial, specifically found appellant competent to stand trial.

To raise and advance the issue counsel for appellant quotes and points to the testimony of both psychiatrists who testified that on the day of the trial she was suffering from the same disease of the mind as allegedly afflicted her on the day she took her husband's life. But from the psychiatric view, entertained by both psychiatrists, that appellant may not have had the mental capacity to commit murder does not necessarily follow the proposition that she was not competent to stand trial. In the latter the

> " * * * 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' "

Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). See State v. Upton, 60 N.M. 205, 290 P.2d 440 (1955).

One of the psychiatrists, whose testimony is asserted as having raised the question of competency to stand trial, speaking to this specific issue on June 9, 1971, fourteen days prior to trial, said:

> "Currently, Mrs. Gardner appears to be a woman of above average intelligence who understands the meaning of the murder charge against her, the consequences of being convicted, and possesses the ability to cooperate in her own defense at trial. * * * *"

The second psychiatrist in his testimony, as it relates to this issue, maintained that appellant spoke clearly and coherently, understood the reason why he was examining her, understood that he would be a witness at her trial, knew where she was and was in touch with reality at the time of examination and, as far as the legal proceedings were concerned, she knew the gravity of her situation. He added that she was able to and did cooperate with him "to the fullest extent."

In the face of this testimony and the prior action of the court on the issue, it is not proper or just for us to hold that, at the time of trial, a showing of reasonable cause for belief that accused was not competent to stand trial was made before the trial judge. See State v. Hovey, 80 N.M. 373, 456 P.2d 206 (Ct.App.1969); State v. Morales, 81 N.M. 333, 466 P.2d 899 (Ct.App.1970).

PHOTOGRAPHS AND CLAIMED PREJUDICE: Three photographs were admitted in evidence over objection of counsel for appellant. The objection was that they were "inflammatory and prejudicial" and not relevant since it was admitted appellant had shot her husband.

The photographs were of decedent's body lying on the couch where he had been shot. Each photograph revealed essentially the same scene but from different perspectives.

Firstly, relevance existed. The charge was murder. The photographs are elo-

quent in revealing an absence of violence or altercation prior to the shooting. This is revealed by the condition and placement of objects in the room and about the couch. All this was relevant to the State's charge of murder.

Also the photographs were visually explanatory and corroborative of testimony of witnesses. State v. Webb, 81 N.M. 508, 469 P.2d 153 (Ct.App.1970). See also State v. Upton, supra.

■ As to inflammation and possible prejudice, we must, as so many times we have held, leave this to the discretion of the trial judge absent a showing of abuse of that discretion. State v. Armstrong, 61 N.M. 258, 298 P.2d 941 (1956); State v. Sedillo, 76 N.M. 273, 414 P.2d 500 (1966); and State v. Webb, supra.

■ We find no error or abuse in admission of the photographs.

INVOLUNTARY MANSLAUGHTER, INSTRUCTION: It is contended the trial court should have instructed the jury on involuntary manslaughter as requested by the appellant.

Appellant's claim is that evidence or testimony exists to support instruction on the proposition that, bearing no malice, she, when wielding and shooting the pistol (a) committed an unlawful act not amounting to a felony, or (b) committed a lawful act which might produce death, in an unlawful manner or without due caution or circumspection. See § 40A–2–3, N.M.S.A., 1953 Comp. (2d Repl. Vol. 6, 1972).

■ While an accused is entitled to instruction on his theory of the case if evidence exists to support it, the court need not instruct if there is absence of such evidence. State v. Ortega, 77 N.M. 7, 419 P. 2d 219 (1966).

The uncontradicted evidence in this case is that appellant killed her husband with not one, but with no less than two and possibly three well placed shots into his person. The parties stipulated that the victim died "as a result of a bullet wound through the right temple of his head, one through the back of his head and one in his right shoulder."

These shots were fired at close range while the victim was lying down on the couch and while appellant stood over him. The shots were fired immediately after a discussion about the victim leaving the appellant and the shots came from a pistol purchased by appellant earlier the day of the homicide. These, also, are uncontradicted facts.

■ Reasonably, no foundation existed for instruction on involuntary manslaughter. We cannot accommodate or relate the facts in this case to the elements of involuntary manslaughter. The trial court properly refused to instruct on this theory of the case.

APPELLANT'S SANITY AS JURY QUESTION: Lastly, we examine appellant's claim that since the only testimony specifically addressed to legal sanity was that of the two psychiatrists who expressed opinions that because of a disease of the mind appellant was incapable of preventing herself from committing the death act, judgment notwithstanding the verdict or a new trial should have been granted. The opinions of the two experts were keyed to the extension of the McNaughten Rule found in State v. White, 58 N.M. 324, 270 P.2d 727 (1954).

As a basis for the claim it is asserted that there was no evidence to support submission of the issue of appellant's sanity to the jury. This position, simply viewed, is that the court should have ruled appellant's legal defense of insanity as having been proven as a matter of law. It must be noted, candidly, that the State produced no direct testimony, lay or expert, or any other evidence specifically addressed to the issue.

On this state of the record appellant constructs the rationale in support of her position in the following manner. In any criminal case the State must prove all elements of the crime charged by proof beyond a reasonable doubt. Where insanity is plead as a defense to the charge of murder the State's burden is first met by the

presumption of sanity. Where, as in this case, the burden shifted to the appellant and she produced her evidence, the opinions of the two experts, it was then incumbent upon the State to produce some evidence to rebut. Since the State failed to produce any evidence on the issue the presumption evaporated or disappeared and there remained no issue properly submissible to the jury. So is woven the thread which binds the claim for reversal.

We cannot accept this perspective on the matter. On this issue this court has previously assumed a position to which we will continue to adhere. Speaking to this very point in 1938 we said:

> " * * *. In the absence of evidence, sanity is assumed to exist without evidence of its existence. When, however, evidence is received which tends to show that the accused was insane at the time of the alleged offense, then, and in such case, an issue is raised as to the mental condition of the accused, and it becomes *the duty of the jury* to determine such issue from the evidence independent of the presumption of sanity. *If the jury, however, disbelieves the evidence, then the presumption stands.* * * * "
> (Last emphasis ours.)

State v. Moore, 42 N.M. 135, 76 P.2d 19 (1938). And see State v. Roy, 40 N.M. 397, 60 P.2d 646 (1936); State v. Victorian, 84 N.M. 491, 505 P.2d 436 (1973); State v. Botello, 80 N.M. 482, 457 P.2d 1001 (Ct.App.1969); State v. Lopez, 80 N.M. 599, 458 P.2d 851 (Ct.App.1969); State v. James, 83 N.M. 263, 490 P.2d 1236 (Ct.App.1971).

■ We can accept the proposition, at least guardedly, that cases may arise where, absent evidence to the contrary, the defendant's evidence on the issue of insanity may be so clear and of such overpowering and persuasive force that reasonable minds can move only in the direction of a finding of insanity. In such a case, a court need not hesitate to rule on the issue as a matter of law. But this is not the case before us.

■ As mentioned, appellant's experts testified that due to a disease of the mind appellant was unable to prevent herself from shooting her husband. However, the opinions of the two experts were contradictory of each other. One of them diagnosed the condition of appellant as "neurotic, obsessive compulsive" without psychosis. The other diagnosed it as a psychosis, "schizophrenia, paranoid type." One testified appellant knew the difference between right and wrong. The other expressed the view that the disease interfered "with her knowing that it was wrong at the time."

Further, there may have been confusion or misunderstanding by one of these experts concerning the legal test of insanity. On the stand, and notwithstanding the balance of his testimony, he said, " * * * I would have to say, no, she is not legally insane."

We believe a fair question was present for jury determination.

The trial court properly refused to grant judgment notwithstanding the verdict or, alternatively, a new trial.

Appellant proposed another point for reversal which is part of the parcel disposed of in the last point discussed above. Disposition of the last point controls point two in appellant's brief in chief.

The judgment is affirmed.

It is so ordered.

McMANUS, C. J., and OMAN, J., concur.