557 P.2d 586

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Douglas and Inez ADAMS, Defendants-Appellants.**

**No. 2524.**

Court of Appeals of New Mexico.

Nov. 2, 1976.

Certiorari Denied Nov. 23, 1976.

Sarah M. Singleton, Pickard & Singleton, Santa Fe, for defendants-appellants.

Toney Anaya, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WOOD, Chief Judge.

Defendants, Douglas and Inez Adams, were convicted of child abuse resulting in the death of their daughter, Charlotte. Section 40A–6–1(C), N.M.S.A. 1953 (2d Repl. Vol. 6, Supp. 1975). They appeal. Issues listed in the docketing statement, but not briefed, are deemed abandoned. *State v. Vogenthaler*, 89 N.M. 150, 548 P.2d 112 (Ct.App.1976). Defendants' brief presents three issues: (1) negligence of Douglas, (2) cause of death, and (3) photographs.

*Negligence of Douglas*

■ ■ This record contains a showing that Charlotte was physically abused. An inference from the evidence is that the physical abuse came from Inez. Douglas contends that he was not convicted on a theory that he abused the child; the State agrees that Douglas did not strike the fatal blow. Douglas contends, and the State agrees, that his conviction was based on negligence. See *State v. Lucero*, 87 N.M. 242, 531 P.2d 1215 (Ct.App.1975).

The issue, as stated by Douglas, is "whether there was sufficient evidence to convict Mr. Adams because he was negligent in allowing Charlotte to be abused." We do not agree. The issue is not whether Douglas allowed the abuse but whether he was negligent in failing to take action in connection with the abuse.

The jury was instructed on negligence by failure to act. "A failure to act, to be negligent, must be a failure to do an act which one is under a duty to do and which a reasonably prudent person in the exercise of ordinary care would do in order to prevent injury * * * to another." See *White v. City of Lovington*, 78 N.M. 628, 435 P.2d 1010 (Ct.App.1967); N.J.I. Civil 12.1.

Parents have a duty to care for their infant child; Douglas had such a duty. *Adoption of John Doe*, 555 P.2d 906 (N.M. App.), decided August 31, 1976, cert. denied October 21, 1976, 90 N.M. ——, 558 P.2d 619; *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101 (1965), cert. denied, 382 U.S. 833, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965).

Douglas knew of the abuse. Although his job as a truck driver caused him to be frequently absent from home, he cancelled a trip in connection with the first hospitalization when Charlotte was approximately seven months old. The diagnosis at that time was severe dehydration; Charlotte was described as "markedly dehydrated", "completely lethargic and almost like she was dead". During this hospitalization it was determined that Charlotte had suffered a break in the humerus which was healing and a recent break in the radius within "the last couple of weeks". She may have had some fractured ribs at this time and may have suffered a broken nose in the past. She had numerous bruises and scabbed areas on her face and in the area of her genitalia. The first hospitalization occurred in December, 1973.

A caseworker from H.S.S.D. (Health and Social Services Department) investigated the situation at defendants' home from December, 1973 up until April, 1974. A second H.S.S.D. caseworker also investigated from April to September, 1975. Douglas testified that he visited with the first caseworker several times in connection with the care of Charlotte. Douglas testified that he discussed freely and openly with the second caseworker the bumps and bruises on Charlotte.

The second hospitalization occurred as a part of the episode resulting in Charlotte's death at age twenty-eight months in October, 1975.

Douglas' testimony affirms that he took no action to care for Charlotte. He admits to having discussed some of the "marks" with Inez, felt that Inez was a good mother and attributed most of the bruises and injuries to Charlotte's play with her older brother. The evidence as to the extent of Charlotte's injuries permits the inference that Douglas did not act as a reasonably prudent person in failing to take action in connection with the abuse.

Douglas asserts a finding that he was negligent was precluded because the two H.S.S.D. investigators found no abuse. This contention ignores the record. The first caseworker reported "I have not been able to prove that either Mr. or Mrs. Adams has intentionally physically abused Charlotte." The second caseworker reported that he " 'could not substantiate any abuse or neglect' ". A supervisor testified it was not a very good job of caseworking. A physician indicated that the caseworkers were in error, "having reviewed the aspects of their records that there probably was probable cause to believe that there was a problem."

The record does not support Douglas' claim that the State "okayed Mr. Adams' conduct" for almost two years; the caseworkers reported a "lack of proof" and there is evidence that the reports were erroneous. Accordingly, we do not reach the question of the legal effect of "approved conduct".

There is substantial evidence that Douglas was negligent.

*Cause of Death*

■ Defendants contend "there is no evidence that shows Charlotte died as a result of child abuse. In short, the State failed to show child abuse *resulted* in death."

Charlotte was pronounced dead during her second hospitalization. External examination revealed thirty-two recent bruises on the body. "Recent" was characterized as less than thirty-six hours old. There were five healing bruises. There were six abrasions. There were two ulcerations on the left shoulder and one healing ulceration on the left shoulder. Twelve of the recent bruises and two of the healing bruises were to Charlotte's head. Internal examination revealed a large recent hemorrhage in the area of the subgaleal fascia and other hemorrhages in the same area associated with one of the external bruises. There was blood in the subdural space, marked swelling of the brain and compression of the brain stem.

The pathologist testified that Charlotte "died of a blow, a blunt force trauma, to the left side of her head that was recent, that is, less than thirty-six hours old." Associated with this blow was a right subdural hematoma "with that being the cause of her death." Associated with the foregoing were the multiple injuries (which the pathologist had previously described) "and in the constellation of these associated injuries and the blow here with the subdural hematoma, I determined that this is an incident of child abuse syndrome."

Child abuse syndrome was identified as a medically recognized term involving multiple evidence of trauma to a child "that is older and more recent, and these may or may not lead to the death of the child involved".

Summarizing the pathologist's testimony, Charlotte's body revealed multiple trauma, old and recent; the recent trauma involved numerous bruises to Charlotte's head, one of these bruises correlated with the subdural hematoma which caused the death; the multiple injuries, including the fatal blow in the left side of her head, were incidents in the record of child abuse.

The physician attending Charlotte at her death testified to numerous bruises on the forehead. "The outstanding one on the left side of what is called the frontal templar region."

The parents' testimony would account for the "left side of the head" blows to which the pathologist and attending physician testified. Inez testified that Charlotte, while at play, hit the side of her face against the stereo three or four days before her death, with a resultant black eye and bumps above her left eye. Defendants would have this evidence considered in relation to medical evidence that it was "possible" that the subdural hematoma developed over a period of days.

Douglas testified that shortly before the second hospitalization, Charlotte had been playing on a glider with her brother, that Douglas saw her on the ground beneath the glider, that Charlotte raised up and

was hit "in the back of the head" by the glider, that the glider hit Charlotte a second time before Douglas could get to the glider to stop it. Defendants would have this evidence considered to show the blow about which the pathologist testified.

Defendants' contention is that there is no direct evidence that Inez delivered the blow which was the immediate cause of death. We agree. Defendants assert that the evidence is circumstantial. We again agree. Defendants claim the circumstantial evidence is insufficient. We disagree.

There is evidence to the effect that the glider incident simply did not happen. If the glider incident did happen, the medical testimony is that the glider incident was inconsistent with Charlotte's injuries. Douglas testified to a blow to the back of the head; the physician testified to a blow to the left side of the frontal templar region. Inez testified to a blow three or four days prior to death; the pathologist testified to a blow less than thirty-six hours old.

Defendants do not claim that there was an absence of evidence linking Inez to the fatal blow. Their contention is that the circumstantial evidence fails to exclude "every reasonable hypothesis of innocence" citing *State v. Malouff*, 81 N.M. 619, 471 P.2d 189 (Ct.App.1970).

The circumstantial evidence rule is no more than a special application of the rule concerning reasonable doubt. It "is not a concept independent of the question of whether there is substantial evidence to support the verdict." *State v. Madrid*, 83 N.M. 603, 495 P.2d 383 (Ct.App.1972). A verdict in a criminal case will not be set aside if supported by substantial evidence; the fact that the evidence is circumstantial does not alter this approach. *State v. Urban*, 86 N.M. 351, 524 P.2d 523 (Ct.App. 1974).

The jury heard the evidence; it was instructed that the State must prove the acts of defendants caused the death beyond a reasonable doubt. By its verdict the jury

determined that the defendants caused Charlotte's death. Substantial evidence supports this determination. See *State v. Burrell*, 89 N.M. 64, 547 P.2d 69 (Ct.App. 1976); Compare, *State v. Coulter*, 84 N.M. 647, 506 P.2d 804 (Ct.App.1973).

*Photographs*

Certain photographs were introduced and used by the attending physician to explain his testimony. Certain photographic slides were introduced and used by the pathologist to explain his testimony. The trial court proceeded carefully, refusing to admit some of the slides because too prejudicial. The record does not show an abuse of discretion and does not show a violation of Evidence Rule 403. *State v. Gardner*, 85 N.M. 104, 509 P.2d 871 (1973), cert. denied, 414 U.S. 851, 94 S.Ct. 145, 38 L.Ed.2d 100 (1973); *State v. Coulter*, supra.

The judgments and sentences are affirmed.

IT IS SO ORDERED.

HENDLEY and HERNANDEZ, JJ., concur.