835 P.2d 840

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Roland Lee AGUAYO, Defendant–
Appellant.**

No. 12957.

Court of Appeals of New Mexico.

April 17, 1992.

Certiorari Denied May 26, 1992.

Tom Udall, Atty. Gen., Patricia Gandert, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Bruce Rogoff, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

BLACK, Judge.

On this court's own motion, the opinion filed in this case on March 17, 1992 is withdrawn, and the following is substituted.

Defendant appeals his conviction for child abuse resulting in death in violation of NMSA 1978, Section 30–6–1 (Cum.Supp. 1989). The State's theory was that Defendant inflicted fatal head injuries on Jose Luis Garcia (Joey), a six-month-old baby.

Defendant did not take the witness stand or present evidence. His counsel, however, argued that it was unclear when the injury occurred, that other people had equal opportunity to inflict the injury, and that Defendant had no motive for doing so. Defendant raises the following contentions on appeal: (1) there was insufficient evidence supporting the verdict; (2) the prosecutor impermissibly commented on Defendant's silence; (3) the trial court erred in admitting alleged evidence of prior bad acts; (4) the trial court erred in admitting purported evidence of his flight; (5) a blue ribbon jury should have been seated; (6) the trial court erred in admitting a doll into evidence; and (7) he was denied effective assistance of counsel. We reverse for a new trial based on Defendant's third contention.

## I. FACTS

Rosemary Garcia testified that she met Defendant at work, began dating him in September 1989, and he moved in with her in November 1989. Thereafter Defendant helped her at home, changed and fed Joey, and bought groceries.

On the day of the incident, Rosemary Garcia went shopping with her children, her two sisters, and their children. Rosemary's sisters testified that Joey was alright during the day, and that there were no accidents. There was, however, evidence that Joey had been frustrated, cranky, and threw up a couple of times. Upon returning home, Rosemary put Joey in his bassinet at about 7:30 p.m. Rosemary then went back out to the grocery store. She returned home fifteen to thirty minutes later. Rosemary testified that upon returning she found Defendant in a bad mood because she had not been where Defendant was to have picked her up that afternoon. Rosemary testified that when she went to the store, Joey was face up; when she returned, he was face down.

Rosemary went to bed but was awakened at 9:00 or 9:30 p.m., when she heard Joey making a noise as though he could not catch his breath. His body was limp and his head hung down. Defendant told Rosemary to take his car and go to the hospital.

Dr. Talamantes, the pediatrician who saw Joey initially, found multiple skull fractures and blood in the brain. Dr. Talamantes testified that he found no significant bruising, but did see evidence of significant trauma. He testified that ordinarily one would expect to find bruising and swelling, and their absence suggested to him that there had been time for the bruising and swelling to dissipate subsequent to the injury. He did testify, however, that in his opinion the primary injury had been inflicted not long before admission. Because of the confusing nature of the symptoms, Dr. Talamantes called in Dr. Penka, a neurosurgeon.

Dr. Penka testified that Joey's injuries could not have been caused accidentally unless he had been hit by a car or fallen from a building. Dr. Penka testified that some aspects of Joey's injuries could have been present for some time, but he was unable to quantify how long. However, he also said it was difficult to imagine that a baby with injuries as severe as Joey's could behave normally for as long as a day.

Joey was transferred to Albuquerque. After being maintained on a respirator for two days, he died.

The director of the medical examiner's office, Dr. McFeeley, performed the autopsy. She testified that there were two small areas of bruising on the back of Joey's head. Dr. McFeeley testified that in her opinion one or more severe blows caused the injuries. She said the seriousness of the injuries precluded an accident such as falling out of bed. Dr. McFeeley said the symptoms from the fractures, the degree of separation, and the severity of the injuries would result in immediate unconsciousness or other severe reaction. The severity of Joey's injuries suggested to her that they were inflicted within the period of one to five hours prior to Joey's admission to the hospital.

Detectives questioned Rosemary at the hospital. She mentioned the babysitter as possibly responsible for the child abuse reported by the doctors. Rosemary also tes-

tified that her four-year-old daughter, Cristal, would pick Joey up and throw him down, and she had to tell Cristal not to do it because she could hurt Joey.

Rosemary's brother-in-law, Gilbert Melendrez, testified that he went to pick up Cristal at Rosemary's apartment after she took Joey to the hospital. Melendrez testified that when he asked Defendant what was wrong with Joey, Defendant said it was none of his "goddamn business." Melendrez further testified that Defendant had come to his apartment earlier in the day, looking for Rosemary. Upon learning she was not there, Defendant slammed his car door and sped off, squealing his tires.

Finally, before Joey was transferred, Rosemary testified she told Defendant that, if he loved her and her kids, he would be there for her in Albuquerque. Defendant said he would go to Albuquerque, but he did not.

## II. SUBSTANTIAL EVIDENCE

We necessarily review Defendant's argument on the substantial evidence issue, because if there is insufficient evidence to support the verdict, we would be compelled to reverse and direct dismissal. As the above recital of relevant facts indicates, this case presents a very close question of the quantum of circumstantial evidence necessary to support a conviction of child abuse resulting in death. *Compare State v. Leal*, 104 N.M. 506, 723 P.2d 977 (Ct.App.1986) *with State v. Sheldon*, 110 N.M. 28, 791 P.2d 479 (Ct.App.), *cert. denied*, 110 N.M. 44, 791 P.2d 798, *cert. denied*, 498 U.S. 969, 111 S.Ct. 435, 112 L.Ed.2d 418 (1990). It is established law in this jurisdiction, as elsewhere, that a properly instructed jury may be justified in returning a guilty verdict based primarily on evidence that the defendant had the best opportunity to inflict the injury. *See Sheldon*, 110 N.M. at 30, 791 P.2d at 481; *Raymond v. State*, 717 P.2d 1147 (Okla. Crim.App.1986) (child in exclusive custody of defendants). Thus there is evidence

from which the jury could have inferred that Defendant inflicted the injury. We must, therefore, reject Defendant's argument based on a lack of substantial evidence. Because the outcome in such child abuse cases often turns upon circumstantial evidence, however, questions of admissibility become paramount. *See United States v. Leight*, 818 F.2d 1297 (7th Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987).

## III. ADMISSION OF PRIOR UNCHARGED CONDUCT

### A. EVIDENCE OF PRIOR ABUSE

Prior to trial, defense counsel moved to prohibit the admission of "prior bad acts" involving Defendant and Joey. While at this pretrial hearing Defendant specifically identified only one of the "anecdotes" to be introduced by the State, it is not clear that Defendant was even aware of the other incidents the State would advance.[1] Defendant argued such evidence was "character assassination" and "certainly prejudicial." The State did not articulate any exception to the general prohibition of such evidence contained in SCRA 1986, 11–404(B) (Rule 404(B)). During trial the district court, relying upon Rule 404(B), allowed testimony of three "other wrongs" perpetrated by Defendant against Joey. The court indicated the incidents could be admitted as evidence of "prior abuse."

At trial, the court permitted Rosemary to testify that, about one month prior to Joey's death, she was talking to a friend in the kitchen when she heard the baby cry in the bedroom. She ran to the bedroom and saw Defendant in the bathroom washing the baby's head. Defendant said "the baby had thrown up" but Rosemary testified she found no evidence of vomit in the bassinet or on Joey's clothes. Rosemary told Defendant she saw no evidence of vomit. Rosemary remembered Defendant's reply was basically, "Can't you understand, that baby just threw up." Defendant then got mad, set the baby down, and went outside.

---

**1.** At the pretrial hearing defense counsel said, "I don't know if they were going to try to get into any other bad acts. They haven't given me a notice of specific bad acts they intend to raise...."

Defendant was given a "continuing objection" to this testimony.

Rosemary's father testified, without further objection, that on a prior occasion he had observed Defendant putting ice water on Joey's head when the baby had a fever. When questioned, Defendant indicated he felt that was the best way to reduce the fever.

There was no testimony that Joey suffered any adverse consequences from either of these incidents.[2] No medical treatment was sought or required and neither "prior bad act" was reported to the authorities.

## B. REQUIREMENTS FOR ADMISSION OF PRIOR UNCHARGED CONDUCT

### 1. *The Evidence Must Be Probative.*

■ Admission of evidence is within the sound discretion of the trial court and the trial court's determination will not be disturbed in the absence of an abuse of that discretion. *State v. Saavedra*, 103 N.M. 282, 705 P.2d 1133 (1985). While trial courts have discretion to strike a balance between probative value and prejudice, they must always be sensitive to the potential prejudice inherent in evidence of the defendant's prior uncharged conduct. *United States v. Lucero*, 601 F.2d 1147 (10th Cir.1979).

■ The initial threshold for admissibility of prior uncharged conduct is whether it is probative on any essential element of the charged crime. *See State v. Fuson*, 91 N.M. 366, 574 P.2d 290 (Ct.App.1978). Indeed, the basic rationale for excluding character evidence is that it is not probative of the fact that the defendant acted consistently with his past conduct in committing the acts at issue. *State v. Bazan*, 90 N.M. 209, 561 P.2d 482 (Ct.App.), *cert. denied*, 90 N.M. 254, 561 P.2d 1347 (1977).

■ Courts admitting evidence of prior incidents of child abuse, therefore, usually require a showing that the prior incident causing injury was at least "substantially similar." *Cf. People v. Wachal*, 156 Ill. App.3d 331, 108 Ill.Dec. 952, 509 N.E.2d 648 (evidence defendant had previously bitten infant admissible where deceased infant had three bites on body), *cert. denied*, 116 Ill.2d 573, 113 Ill.Dec. 314, 515 N.E.2d 123 (1987).

In the present case, there is no evidence that either of the alleged incidents, in which Defendant put water on Joey's head, was malicious or harmful, and Rosemary specifically testified Defendant never struck Joey. Although Defendant did not take the stand to explain these previous incidents,[3] his counsel's explanation of both incidents is consistent with an effort, however clumsy, to help Joey.

■ Although the State offered the trial court no rationale for the admission of Defendant's prior "bad acts," except that they involved "the same baby," the State now argues these incidents are evidence of intent. There is no question that evidence of prior crimes, wrongs, or acts can be probative of intent and therefore specifically excepted under Rule 404(B). *See, e.g., United States v. Marquardt*, 695 F.2d 1300 (11th Cir.) (intent to conspire to distribute drugs), *cert. denied*, 460 U.S. 1093, 103 S.Ct. 1793, 76 L.Ed.2d 360 (1983); *United States v. Verkuilen*, 690 F.2d 648 (7th Cir. 1982) (intent to evade taxes). Evidence of certain types of injury to a child can be probative of the fact that the physical damage was caused intentionally rather than by accident, and thus can be persuasive of intent. *United States v. Leight*, 818 F.2d at 1299; *United States v. Harris*, 661 F.2d 138, 142 (10th Cir.1981). Indeed, it has been held permissible to admit evidence of

---

**2.** Gilbert Melendrez also testified he once saw Defendant giving Joey a dark brownish substance from a glass. Melendrez further testified that when questioned, Defendant just handed the baby to Rosemary. Since Defendant did not object to this testimony, however, we do not consider it in reaching our decision. *See* SCRA 1986, 12–216.

**3.** One of the additional complications in this case was Defendant's failure to testify after the trial court ruled that evidence of his prior convictions for acts of dishonesty (receiving stolen property, grand theft, etc.) could be a subject of inquiry if he testified.

"battered child syndrome" to prove intent when there is no evidence that the defendant was the perpetrator of the prior injuries. *Estelle v. McGuire,* —— U.S. ——, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).[4]

■■■■ Admitting evidence that the baby was previously injured by someone's intentional acts is, however, very different from admitting evidence that this defendant's prior conduct toward the child, even though it resulted in no harm, might be interpreted as sinister. While the difference between admitting prior injuries and declining to admit evidence of a defendant's ambiguous conduct toward the child may not appear significant at first blush, it goes to the heart of Rule 404(B). Evidence that the child has previously been injured by the intentional actions of an adult is probative a crime has been committed. The defendant's actions toward the child, on the other hand, are probative of the identity of the perpetrator and therefore must go beyond the defendant's general character or disposition to be admissible under Rule 404(B). "A state of mind that continues over time and governs otherwise unconnected acts is generally called a person's character trait or propensity." Lee E. Teitelbaum & Nancy A. Hertz, *Evidence II: Evidence of Other Crimes as Proof of Intent,* 13 N.M.L.Rev. 423, 430 (1983). Admission of character traits to prove that the defendant acted in accordance with those traits is, of course, exactly what Rule 404(B) is designed to prohibit. *State v. Reneau,* 111 N.M. 217, 804 P.2d 408 (Ct. App.1990). Testimony which amounts to evidence of the defendant's bad character or disposition to commit the crime charged is clearly inadmissible and prejudicial. *State v. Alberts,* 80 N.M. 472, 457 P.2d 991 (Ct.App.1969).

■■■ The courts have recognized this distinction by generally admitting evidence of "battered child syndrome,"[5] but uniformly holding that evidence that the defendant meets the "battering parent syndrome" profile is inadmissible.[6] Evidence admissible under "battered child syndrome" negates accidental injury and is probative of physical abuse by a person of mature strength,[7] but the jury must still decide whether the particular injury in question was caused by the defendant. *People v. Jackson,* 18 Cal.App.3d 504, 95 Cal.Rptr. 919, 921 (1971); *State v. Toennis,* 52 Wash.App. 176, 758 P.2d 539, 545 (1988). The Supreme Court of North Carolina captured the importance of the difference, saying:

> Contrary to what defendant seems to argue, neither physician testified, nor should he have been permitted to do so, that the battered child syndrome from which this victim suffered was in fact caused by any particular person or class of persons engaging in any particular activity or class of activities. Nowhere in the record did either physician express or purport to express an opinion as to defendant's guilt or innocence. On these kinds of factual questions the physicians would have been in no better position to have an opinion than the jury.

*State v. Wilkerson,* 295 N.C. 559, 247 S.E.2d 905, 911 (1978).

In the instant case we have the reverse situation. Defendant's prior conduct to-

---

**4.** In *Estelle* the Supreme Court held admission of evidence of "battered child syndrome" did not violate due process. In so holding, the majority expressly rejected the claim that the trial court had given a "propensity" jury instruction and relied upon another instruction which advised that the " '[prior injury] evidence, if believed, was not received, and may not be considered by you[,] to prove that [the defendant] is a person of bad character or that he has a disposition to commit crimes.' " —— U.S. at ——, 112 S.Ct. at 478.

**5.** *State v. Robinson,* 93 N.M. 340, 600 P.2d 286 (Ct.App.1979); *State v. Adams,* 89 N.M. 737, 557 P.2d 586 (Ct.App.) ("child abuse syndrome"), *cert. denied,* 90 N.M. 7, 558 P.2d 619 (1976); *People v. DeJesus,* 71 Ill.App.3d 235, 27 Ill.Dec. 448, 389 N.E.2d 260 (1979); *State v. Durfee,* 322 N.W.2d 778 (Minn.1982).

**6.** *People v. Walkey,* 177 Cal.App.3d 268, 223 Cal. Rptr. 132 (1986); *Sanders v. State,* 251 Ga. 70, 303 S.E.2d 13 (1983); *State v. Loebach,* 310 N.W.2d 58 (Minn.1981).

**7.** In the instant case such evidence could have been probative of the fact the injuries were probably not caused by Joey's four-year-old sister.

ward the baby was not particularly probative of an intentional injury to the baby but clearly did link Defendant to such acts. Neither Joey's mother nor grandfather, who were present at the time of these prior incidents, was willing to say they felt Defendant was intentionally attempting to harm Joey with the water. Nor are we. As noted earlier, both incidents would appear consistent with either salubrious or malevolent intent. Moreover, since the primary issue in this case is who inflicted the fatal injuries, the danger is that evidence of Defendant's "intent" on the night of the hospitalization is likely to become confused with Defendant's alleged general propensity to mistreat Joey.

### 2. *The Trial Court Must Balance the Prejudicial Effect of the Evidence Against Its Probative Value.*

■ Even if Defendant's prior actions toward Joey were probative of criminal intent on the evening of the fatal injury, the court must weigh the probative value against the potential for prejudice. *See State v. Lara*, 110 N.M. 507, 797 P.2d 296 (Ct.App.), *cert. denied*, 110 N.M. 330, 795 P.2d 1022 (1990). Empirical studies indicate that uncharged misconduct is generally "one of the most damning species of evidence." Edward J. Imwinkelried, *The Plan Theory for Admitting Evidence of the Defendant's Uncharged Crimes: A Microcosm of the Flaws in the Uncharged Misconduct Doctrine*, 50 Mo.L.Rev. 1, 23 (1985); *see also United States v. Shavers*, 615 F.2d 266 (5th Cir.1980). While, as here, the probative value of such evidence is often not very great, its prejudicial effect can be substantial. Edward W. Cleary, *McCormick on Evidence* § 190 (3d ed. 1984); Calvin W. Sharpe, *Two–Step Balancing and the Admissibility of Other Crimes Evidence: A Sliding Scale of Proof*, 59 Notre Dame L.Rev. 556, 560 (1984). Determining whether evidence of other crimes or wrongs should be admitted therefore requires a careful analysis of

such evidence. Imwinkelried, *supra*, at 21; Teitelbaum & Hertz, *supra*, at 423.

This court recognized the prejudicial potential of prior uncharged conduct in reversing a conviction in an analogous factual context in *State v. Mason*, 79 N.M. 663, 448 P.2d 175 (Ct.App.), *cert. denied*, 79 N.M. 688, 448 P.2d 489 (1968). Mason was convicted of sexual assault upon an eleven-year-old girl and attempted rape of a twelve-year-old girl. The district court, without objection,[8] admitted testimony by two fifteen-year-old girls that they had sexual relations with the defendant in the four months preceding the acts for which the defendant was convicted. *Id.* at 665, 448 P.2d at 177. Speaking for the majority, Judge Oman made several observations equally relevant here:

> Because of the emotional persuasiveness of evidence involving sex offenses with or upon children, the evidence of similar but distinct offenses with or upon other children should ordinarily be excluded. The danger or [sic] prejudice so often outweighs the permissible probative value of such evidence. This does not mean such evidence may not properly be received if it is relevant to, and its probative force is sufficiently great upon, some material element of the crime charged which is in issue and upon which there is doubt, such as identity, intent, knowledge, etc. We mean only that such evidence should not be received when very probably its sole result, or at least its overwhelming result, will be that of establishing defendant's bad character, or his disposition or propensity to commit crime, as the basis for an inference that he committed the crime with which he is charged and for which he is being tried. [Citations omitted.]

*Id.* at 667, 448 P.2d at 179.

■ The potential for prejudice is especially great in cases where the evidence is entirely circumstantial and such uncharged conduct may thus assume a crucial role. *See* Imwinkelried, *supra*, at 21. While the

---

**8.** Although the defendant's counsel did not object to the specific questions, he did, as here, move to suppress such testimony prior to trial, and he maintained a standing objection to any testimony by these witnesses.

courts have recognized the potential for this type of evidence to cause prejudice in many contexts, it can be incendiary in child abuse cases. As Professor Sharpe points out:

> That is, other crimes evidence often has significant probative potential in child abuse cases. On the other hand, because of the jury's presumed angry reaction to parental abuse of defenseless children, the degree of prejudice is unusually high. It is not surprising to find, therefore, that in this class of cases courts are very careful in their analysis of proof and require a high standard of certainty before admitting this evidence.

Sharpe, *supra*, at 583. We believe in these volatile cases the courts must be especially careful in applying the rules of evidence. We therefore agree with the conclusion of Michael S. Orfinger in his recent commentary, *Battered Child Syndrome: Evidence of Prior Acts in Disguise*, 41 Fla.L.Rev. 345, 367 (1989): "In their laudable fervor to punish child abuse, courts still must adhere to fundamental rules of evidence. The rules exist to guarantee fair results based on objective standards. The odium with which the public views certain offenses cannot justify deviating from evidentiary norms."

 Although, as noted, it has been argued that the rules of evidence should be interpreted more loosely in child abuse cases because of the difficulty of proving a crime against a mute victim and because other witnesses are usually unavailable, like other courts we reject this siren song. *See, e.g., State v. Loebach*, 310 N.W.2d 58 (Minn.1981).

The potential to allow jury prejudice to lessen the burden of proof is the very rationale for prohibiting character evidence under the guise of "battering parent syndrome." In a note, *The Battering Parent Syndrome: Inexpert Testimony as Character Evidence*, the author emphasizes the need for being especially sensitive when performing the balancing of probative and prejudicial effect in child abuse cases:

> Not surprisingly, the argument for an exception to the character evidence rule has arisen in the context of prosecutions for criminal child abuse. Serious crimes engender serious revulsion, and reasonable people feel little sympathy for child abusers. Yet it is exactly for the protection of persons charged with especially revolting crimes that our legal system embraces a due process model of criminal procedure. Especially when the initial evidence seems overwhelmingly to implicate a parent in the death of her infant child, the law surrounds her with a presumption of innocence, and burdens the state with proving beyond a reasonable doubt that this particular defendant committed the particular crime charged. The character evidence rule's concern with protecting the defendant from prejudice addresses precisely this fundamental goal of the due process model. Character evidence is excluded for fear "that the jury will convict a defendant in order to penalize him for his past misdeeds, or simply because he is an undesirable person."
>
> However strong the state's need for evidence in an abuse prosecution, the alleged abusing parent ought to be entitled to the same adjudication of individual guilt as is any other criminal defendant. [Footnotes omitted.]

Thomas N. Bulleit, Jr., Note, *The Battering Parent Syndrome: Inexpert Testimony as Character Evidence*, 17 U.Mich. J.L.Ref. 653, 673–74 (1984).

In the present case, we believe the potential for prejudice of these prior incidents was further compounded by the failure of defense counsel to request a limiting instruction. *Cf. Estelle v. McGuire*, —— U.S. at ——, 112 S.Ct. at 484 (O'Connor, J., dissenting) ("The fact that a 6–month–old child was repeatedly beaten in the course of her short life is so horrifying that a trial court should take special care to inform the jury as to the significance of that evidence."). If counsel had requested SCRA 1986, 14–5028, it would, of course, have been reversible error to refuse it. *State v. Sanders*, 93 N.M. 450, 601 P.2d 83 (Ct.App. 1979).

■ In conclusion, we are not able to determine whether the trial court properly balanced admission of the testimony regarding prior bad acts with its prejudicial effects. This is due to the State's failure to articulate what the evidence was probative of, or why a cognizable exception to the rationale underlying Rule 404(B) applied. *See State v. Lara*, 109 N.M. 294, 784 P.2d 1037 (Ct.App.) (exceptions of Rule 404(B) not exclusive), *cert. denied*, 109 N.M. 262, 784 P.2d 1005 (1989). In the absence of a defined basis it is prejudicial error to admit evidence of such prior uncharged conduct. *State v. Ross*, 88 N.M. 1, 536 P.2d 265 (Ct.App.1975); *State v. Garcia*, 83 N.M. 51, 487 P.2d 1356 (Ct.App. 1971).

■ If the other evidence of Defendant's guilt were overwhelming, error in allowing such evidence might not require a new trial. *State v. Vialpando*, 93 N.M. 289, 599 P.2d 1086 (Ct.App.1979). Where, however, as here, the evidence, while being sufficient to sustain a conviction of such a heinous crime, is marginal, the admission of unexplained dissimilar prior bad acts makes a new trial appropriate. *State v. Saavedra*, 103 N.M. 282, 705 P.2d 1133 (1985) (affirmed after remand); *State v. Mason*, 79 N.M. 663, 448 P.2d 175 (Ct. App.), *cert. denied*, 79 N.M. 688, 448 P.2d 489 (1968). The present record offers no obvious rationale for the admission of Defendant's prior conduct towards Joey and we cannot say from the record that the admission of such evidence did not unreasonably prejudice the minds of the jurors.

Since this case is remanded for a new trial, we comment briefly on Defendant's remaining contentions.

## IV. BLUE RIBBON JURY

Defendant argues that a "blue ribbon" jury of medical experts should have been impaneled, because this case turns on complex medical testimony. We reject this argument out of hand. Apart from the shadow of the Seventh Amendment, and Article 2, Section 14, of the New Mexico Constitution, *see State v. Aragon*, 109 N.M. 197, 784 P.2d 16 (1989), regular petit juries are able to rationally consider evidence substantially more complex than that introduced by the three medical experts in this case. *See* Harry Kalven, Jr. & Hans Zeisel, *The American Jury* 157 (1966).

## V. EVIDENCE OF FLIGHT

Defendant argues he was given a Hobson's choice when the State introduced evidence that he did not voluntarily appear at the police station after the local police department indicated to several other people they were looking for him. Defendant points out that he had recently learned of existing warrants on drug-related charges, and this was a basis for his not affirmatively seeking further conversation with the local police about what happened to Joey. We recently resolved this issue against Defendant's position on similar facts. *See State v. Kenny*, 112 N.M. 642, 818 P.2d 420 (Ct.App.), *cert. denied*, 112 N.M. 499, 816 P.2d 1121 (1991).

## VI. PROSECUTOR'S COMMENT

During closing argument the assistant district attorney reasoned there was only one possibility as to who could have harmed Joey, stating, "and no one else in this courtroom has presented any evidence that anybody ..." At this point defense counsel objected and, during a bench conference, argued that this was an improper comment on Defendant's failure to testify.

■ To evaluate allegedly improper prosecutorial comments, we determine whether the language used was manifestly intended to be a comment on the accused's failure to testify, or was of such a character that the jury would naturally and necessarily take it to be such a comment. *State v. Clark*, 108 N.M. 288, 772 P.2d 322, *cert. denied*, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989). It is permissible to comment on a defendant's failure to produce witnesses if the comment is not one on the defendant's failure to testify. *State v. Ennis*, 99 N.M. 117, 654 P.2d 570 (Ct. App.), *cert. denied*, 99 N.M. 148, 655 P.2d 160 (1982). While we cannot say the remark in this case was manifestly intended to direct the jury's attention to Defendant's

failure to testify, we are also not certain it was simply a comment on Defendant's failure to produce witnesses. In our judgment, the district attorney's statement came dangerously close to improper comment requiring reversal. We urge counsel, on retrial, to follow the trial court's admonition and "shy away" from such comments.

## VII. CONCLUSION

Because the trial court erred in admitting evidence of prior uncharged conduct and we cannot say that evidence did not affect the verdict, we reverse and remand for a new trial. If the State wishes to offer all or part of this or similar evidence on retrial, it must articulate its rationale for admission so the district court can adequately weigh the probative value of that evidence against its prejudicial effect.

Reversed and remanded.

IT IS SO ORDERED.

BIVINS and APODACA, JJ., concur.