2008-NMCA-086

186 P.3d 916

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**David HASKINS, Defendant–Appellant.**

**No. 26,595.**

Court of Appeals of New Mexico.

April 2, 2008.

Certiorari Denied, No. 31,064,
May 14, 2008.

Gary K. King, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} Defendant, a massage therapist, was convicted of eight counts of criminal sexual contact of a minor (CSCM) by use of coercion by a person in a position of authority, contrary to NMSA 1978, § 30–9–13(A) (2003). On appeal, he argues that (1) there was insufficient evidence to prove that he was in a position of authority over the victims, (2) his sentences violated double jeopardy on a multiple punishment, unit of prosecution theory, (3) the trial court abused its discretion in allowing certain testimony concerning aspects of massage theory, and (4) the trial court erred in allowing videotaped witness testimony. We affirm.

## FACTS

{2} Defendant's convictions arise from actions he took while administering massage therapy to Jessica, age 15, and Stephanie, age 17. Jessica testified that she first went to Defendant's house to split a one-hour massage with her mother. This was the first massage she had ever received. She did not have a conversation with Defendant about what the massage would entail, and she did not complete a consent form prior to the massage. Jessica undressed to her underwear, covered herself with a sheet, and lay down on the table. Defendant entered the room and massaged Jessica's head, back, stomach, legs, feet, and arms. He then told Jessica that breast massage was part of the massage, and he asked if she would like it done. Jessica consented because she thought it was part of the massage. Defendant removed the sheet and fully massaged her breasts. Defendant also massaged Jessica's bare buttocks without consent, but Jessi-

ca thought that this was also a normal component of a full-body massage. Jessica left without having any concerns about the massage or about Defendant.

{3} Jessica returned to Defendant's home for a second massage about a month later. This session also included several minutes of full breast massage. Defendant performed the massage under the sheet and Jessica was not wearing a bra. Defendant informed Jessica when he was about to begin massaging her breasts, but he did not seek her consent. Jessica again thought this was part of a normal full-body massage. She testified that Defendant seemed like a professional and that it seemed like he knew what he was doing. Defendant also massaged Jessica's buttocks without consent during this second massage.

{4} Defendant then asked Jessica if she wanted a vulva massage. When Jessica asked what that was, Defendant put his hand inside Jessica's underwear and touched her vagina. Jessica declined to have her vulva massaged, Defendant removed his hand from her underwear, and that was the end of the massage. After Jessica was fully dressed, Defendant gave her a hug, in the process brushing his hand over Jessica's buttocks. Jessica left feeling uncomfortable, because she knew that a vulva massage was not part of a regular massage. Jessica's mother notified the police of Defendant's actions the same day.

{5} Stephanie testified that she went to Defendant to try to heal nerve damage to her arm suffered in an automobile accident. Stephanie's mother helped her fill out paperwork showing which body parts she did not want Defendant to touch, including her breasts and buttocks. Stephanie undressed to her bra and underwear. Defendant told her that he would give her a full-body massage for the same price as an arm massage. Defendant worked on Stephanie's arm, shoulders, neck, and chest. He then began to massage Stephanie's breasts over her bra without seeking her consent. Instead, he asked if she had menstrual cramps or breast tenderness, and Stephanie replied that she did not. Stephanie testified that she felt very uncomfortable, but that she did not say

anything because Defendant was explaining what he was doing. He spent about five minutes on each breast, including the nipples. He then massaged her stomach, legs, and back. Finally, he massaged her buttocks, pulling her underwear to one side to do so. This made Stephanie uncomfortable, but because he was explaining what he was doing, Stephanie thought it was part of a normal full-body massage.

{6} Stephanie returned to Defendant four or five times over the next few months. Each time, Defendant massaged her breasts. The last time Stephanie went to see Defendant, she had just given birth and she was not producing breast milk. Defendant had told Stephanie's mother that he could help the problem by massaging an area under Stephanie's arm. When Stephanie came in, Defendant had her undress and remove her bra. Then, without explaining why he was doing so, he proceeded to massage her full breast, pinching her nipples the way a baby would suckle them. This made Stephanie feel very uncomfortable. Defendant then told Stephanie that when his wife was pregnant, he would suckle her breasts to try to bring in her milk. He offered to suck on Stephanie's breasts for the same reason. Stephanie immediately ended the session. She never returned to Defendant.

{7} Following a police investigation into the above incidents, Defendant was charged, indicted, tried, and convicted of eight separate counts of CSCM by use of coercion by a person in a position of authority (1) for touching Jessica's breasts during her first massage session, (2) for touching her breasts, (3) vulva, and (4) buttocks at her second session, and (5–8) for touching Stephanie's breasts on four separate occasions. Additional facts, as established at trial, will be introduced as necessary in our analysis below.

## DISCUSSION

### Sufficiency of the Evidence

■ {8} In order to convict Defendant of CSCM by use of coercion by a person in a position of authority, the State had to prove the following beyond a reasonable doubt: (1) Defendant touched or applied force to the breasts, buttocks, or vulva of the victim; (2)

Defendant was a person who, by reason of his relationship to the victim, was able to exercise undue influence over the victim and used this authority to coerce the victim to submit to the sexual contact; (3) the victim was at least 13 years old but less than 18 years old; (4) Defendant's act was unlawful; and (5) the act happened in New Mexico. UJI 14–926 NMRA. On appeal, Defendant challenges only the second element, contending that there was insufficient evidence presented to prove that he was in a position of authority over Jessica and Stephanie and that by reason of this position, he was able to exercise undue influence over the girls. This Court must determine whether a rational jury could have found this element beyond a reasonable doubt, while viewing the evidence in the light most favorable to the jury's verdict and indulging all inferences in favor of upholding that verdict. *State v. Segura*, 2002–NMCA–044, ¶ 10, 132 N.M. 114, 45 P.3d 54. We do not substitute our judgment for that of the factfinder concerning the credibility of witnesses or the weight to be given their testimony. *State v. Riggs*, 114 N.M. 358, 362–63, 838 P.2d 975, 979–80 (1992).

{9} A person in a "position of authority" is defined under New Mexico law as "that position occupied by a parent, relative, household member, teacher, employer or other person who, by reason of that position, is able to exercise undue influence over a child." NMSA 1978, § 30–9–10(F); *see also State v. Gardner*, 2003–NMCA–107, ¶ 38, 134 N.M. 294, 76 P.3d 47 (holding that assistant principal used position of authority "to gain the trust of the victims, to obtain the opportunity to touch the victims, and to cause them to submit to his unlawful touching"); *Segura*, 2002–NMCA–044, ¶¶ 16–17, 132 N.M. 114, 45 P.3d 54 (holding that, but for faulty jury instruction, uncle's conviction for criminal sexual contact with a minor by person in position of authority would have been upheld); *State v. Corbin*, 111 N.M. 707, 710, 809 P.2d 57, 60 (Ct.App.1991) (holding that employer controlled the victim's will, at least in part, by using his position as the victim's employer); *State v. Gillette*, 102 N.M. 695, 702, 699 P.2d 626, 633 (Ct.App.1985) (holding that live-in babysitter was in position of au-

thority over child). The question of whether a massage therapist may be found to be in a position of authority for purposes of CSCM is a question of first impression in New Mexico. We answer this question in the affirmative and hold that based on the evidence in this case, a rational jury could have found that Defendant was in a position of authority over Jessica and Stephanie.

{10} Both victims testified in a manner that could lead a rational jury to conclude that they perceived Defendant to be in a position of authority over them. Jessica's first massage with Defendant was the first she had ever experienced, and she neither completed a consent form nor conversed with Defendant about the body parts she would allow him to massage. Once the massage began and she was told that a breast massage was part of a normal body massage, she consented in the belief that Defendant was a professional whose explanations were in her best interest. She also believed that a buttock massage was a normal component of a full-body massage. A rational jury could reasonably infer that it was not until Defendant touched Jessica's vagina without warning that she realized that Defendant was perhaps not behaving in a professional manner, but that until that point Jessica believed Defendant to be a professional health care provider who was in a position of authority over her and used this position to exercise undue influence over her, as evidenced by his ability to convince her that breast and buttock massages are normal components of a full-body massage. *See State v. Trevino*, 113 N.M. 804, 807, 833 P.2d 1170, 1173 (Ct.App. 1991) (holding that use of a position of authority to coerce sexual contact may be proven inferentially), *aff'd in part by State v. Orosco*, 113 N.M. 780, 833 P.2d 1146 (1992), and *aff'd in part by* 116 N.M. 528, 865 P.2d 1172 (1993).

{11} Similarly, Stephanie testified that she had thought Defendant was professional because he went to school for massage therapy, and as a result he "knows what he's supposed to be doing and what he shouldn't be doing." She thought that as a trained professional, Defendant would know "the difference between right and wrong." Although Stepha-

nie's breast and buttock massages were given without consent and in disregard of the fact that she had marked that she did not want either of these areas touched on the consent form she filled out prior to her first massage, she testified that Defendant explained what he was doing as he massaged her breasts and buttocks, and because of this fact, she did not ask questions or object to Defendant's actions. As in Jessica's case, a rational jury could infer that it was not until Defendant crossed a deeply personal line, i.e., asking if she would like him to suckle her breasts, that Stephanie realized that Defendant had perhaps been overstepping the bounds of professionalism, but that until that point Defendant was in a position of authority over her and exercised undue influence in the form of unconsented breast and buttock massages.

{12} Defendant contends that his relationship with Jessica and Stephanie was akin to a master-servant relationship and that as an employee of the girls, he was required to obey their instructions and thus was not in a position of authority. This argument belies the facts of the case. Jessica never filled out any consent forms and never instructed Defendant in any manner with the exception of consenting to breast massage. She certainly did not instruct Defendant to put his hand on her vagina, massage her buttocks, or touch her buttocks when he hugged her. Moreover, Defendant's massage of Stephanie's breasts defied her explicit instructions in the consent form she completed prior to her first massage. We do not understand the fact that either girl ultimately consented or failed to object to breast or buttock massage, once undressed and within the power of Defendant's authority and subject to his will as a presumed professional, to mean that they "instructed" Defendant in any sense of the word, and we hold that a rational jury could have found the same. *See id.* ("Common sense and experience teach[ ] us that children generally yield to the wishes of adults.").

{13} Defendant's argument also runs contrary to the training Defendant received at the Mesilla Valley School of Therapeutic Arts, whose owner, Wanita Thompson, testified at trial. Thompson testified that the

massage therapist-client relationship involves a power imbalance due to three factors: (1) the patient has a tendency to believe what a professional therapist says, (2) individuals who take their clothes off and are in a room one-on-one with a therapist have a feeling of vulnerability, and (3) massage therapy is intended to relax the client and produce a feeling of well-being that increases the patient's vulnerability. This power imbalance is also codified in the massage profession's Code of Professional Conduct, which was promulgated by the legislatively created Massage Therapy Board in order "to protect the public from unlawful, improper and incompetent practice of massage therapy," NMSA 1978, § 61–12C–2 (1999), and which states in pertinent part: "It is presumed that a power imbalance exists in professional relationships between licensees and clients." 16.7.2.8(B) NMAC (2001). Thompson's testimony and the regulatory presumption of power imbalance further buttress the jury's finding that Defendant was in a position of authority over the girls.

{14} Although Defendant contests the jury's finding that he was able to exercise undue influence over the girls, he provides no factual support for this assertion. *Undue influence results from a moral, social, or domestic force exerted upon a party, so as to control the free action of his or her will.* *Gardner,* 2003–NMCA–107, ¶ 22, 134 N.M. 294, 76 P.3d 47. That influence must be the means of compelling submission to the contact; such coercion "might take many forms, but is less overtly threatening than physical force or threats." *Id.* (internal quotation marks and citation omitted). We hold that a rational jury could have found that Defendant used his position of authority as a trained professional to control the free action of the girls' wills by the very fact that they consented or failed to object to the massaging of their intimate parts. The girls testified that they were alone with Defendant in a confined space over which Defendant had control. *See Trevino,* 113 N.M. at 807, 833 P.2d at 1173. In Jessica's case, she was alone with Defendant in a room in his home, and in Stephanie's case, she was alone with him in an office. The additional facts that the girls were young, nearly nude, and in a

state of relaxation provide additional inferential evidence that Defendant was in a position to control the free action of their wills. Accordingly, we hold that a rational jury could have found that Defendant was in a position to exert undue influence over the girls, and we affirm Defendant's convictions.

## Double Jeopardy, Unit of Prosecution Analysis

{15} Both the federal and New Mexico constitutions contain a double jeopardy clause guaranteeing that no person shall be "twice put in jeopardy" for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15. "These guarantees protect an individual against successive prosecutions for the same offense after an acquittal or conviction and against multiple punishments for the same offense." *State v. Reyes–Arreola,* 1999–NMCA–086, ¶ 6, 127 N.M. 528, 984 P.2d 775. Defendant contends that the three acts of touching Jessica's breasts, vulva, and buttocks at her second massage session constituted a single criminal offense and that Defendant's multiple punishments violate double jeopardy. Because there are no disputed material facts, we review Defendant's double jeopardy challenge using a de novo standard of review. *See id.* ¶ 5.

{16} In *Swafford v. State,* 112 N.M. 3, 810 P.2d 1223 (1991), our Supreme Court distinguished between two facets of New Mexico's double jeopardy, multiple punishment doctrine: unit of prosecution cases and double description cases. Each facet is analyzed differently under our double jeopardy jurisprudence. In unit of prosecution cases, such as the case before us, "the defendant has been charged with multiple violations of a single statute based on a single course of conduct. The relevant inquiry in those cases is whether the legislature intended punishment for the entire course of conduct or for each discrete act." *Id.* at 8, 810 P.2d at 1228. Our analysis begins with an examination of the statute under which the defendant has been convicted in order to discern whether the legislature intended to create a separate offense for each violation of the statute that occurred during a continuous series of

events. *Herron v. State*, 111 N.M. 357, 359–62, 805 P.2d 624, 626–29 (1991).

{17} New Mexico's criminal sexual contact of a minor statute prohibits "the unlawful and intentional touching of or applying force to the intimate parts of a minor or the unlawful and intentional causing of a minor to touch one's intimate parts." Section 30–9–13. Our courts have routinely treated this language as ambiguous for purposes of multiple punishment, unit of prosecution analysis. *See State v. Ervin*, 2008–NMCA–016, ¶ 44, 143 N.M. 493, 177 P.3d 1067; *Segura*, 2002–NMCA–044, ¶¶ 7–8, 132 N.M. 114, 45 P.3d 54; *State v. Laguna*, 1999–NMCA–152, ¶¶ 37–38, 128 N.M. 345, 992 P.2d 896. Because the statute is ambiguous, it is assumed that the legislature did not intend multiple punishments absent proof that each act in the course of conduct was "in some sense distinct from the others." *Herron*, 111 N.M. at 361, 805 P.2d at 628. To make this determination, we turn to several factors to ascertain whether Defendant's touchings of Jessica's breasts, vulva, and buttocks over the course of a one-hour massage were separated by sufficient indicia of distinctness, including (1) the temporal proximity of the acts, (2) the location of the victim during each act and whether there was movement or repositioning of the victim, (3) the existence of an intervening event, (4) the sequencing of the acts, (5) the defendant's intent as evidenced by his conduct and utterances, and (6) the number of victims. *Id.* "These are flexible factors intended to guide appellate courts in unit of prosecution analyses." *State v. Glascock*, 2008–NMCA–006, ¶ 14, 143 N.M. 328, 176 P.3d 317, *cert. granted*, 2008–NMCERT–001, 143 N.M. 398, 176 P.3d 1130. "No single factor is controlling." *Id.*

■ {18} Several of the *Herron* factors weigh in favor of multiple punishments. Under the first factor, the temporal proximity of the acts, the greater the interval between the acts the greater likelihood of separate offenses. *Herron*, 111 N.M. at 361, 805 P.2d at 628. During Jessica's one-hour massage, Defendant first massaged various parts of her body, then her breasts, then "finished the rest of the massage," concluding by touching her vulva. Defendant then touched Jessica's buttocks when he gave her a hug following completion of the massage. We hold that the three touchings were sufficiently separate in time to be considered separate offenses. Turning to the second factor, movement or repositioning of the victim, Jessica testified that she was face down at the beginning of the massage, was lying on her back when Defendant touched her vulva, and was in the living room when Defendant touched her buttocks. We hold that Jessica's position was sufficiently distinct each time she was touched to support a finding of separate offenses. We note that this factor is specifically tailored to sex crimes, and we find it particularly compelling in this case. *See State v. Boergadine*, 2005–NMCA–028, ¶ 23, 137 N.M. 92, 107 P.3d 532 (noting that the second and fourth *Herron* factors, location of the victim and sequencing of the acts, are tailored to address unit of prosecution issues in cases involving sex offenses); *cf. State v. Dominguez*, 2005–NMSC–001, ¶ 23, 137 N.M. 1, 106 P.3d 563 (stating that the sixth *Herron* factor, the number of victims, is particularly important for crimes of violence).

{19} Looking to the third *Herron* factor, there was certainly an intervening event between Defendant touching Jessica's vulva and touching her buttocks, i.e., Jessica clothing herself and going to the living room to pay Defendant, but it is difficult to say from her testimony whether there were any events between the breast massage and Defendant touching her vulva with the exception of "finish[ing] the rest of the massage." Nonetheless, we hold that this factor weighs in favor of multiple punishments. With regard to the fourth factor, the sequencing of the acts, we analogize to the criminal sexual penetration context, in which serial penetrations of different orifices, as opposed to repeated penetrations of the same orifice, tend to establish separate offenses, *Herron*, 111 N.M. at 361, 805 P.2d at 628, in that Jessica was touched in three separate locations on her body, a fact which weighs in favor of separate offenses. Again, because this factor specifically contemplates sex crimes, it contributes heavily to a finding of separate offenses in this case. *See Boergadine*, 2005–NMCA–028, ¶ 23, 137 N.M. 92, 107 P.3d 532.

{20} Two factors weigh against a finding of separate offenses. Defendant's conduct or utterances do not necessarily indicate that his intent to touch her in an unlawful manner changed over the course of the massage, or afterward. He informed her when he was going to begin massaging her breasts, but he did not tell her when he was about to put his hand in her underwear and touch her vulva, and he did not say anything when he touched her buttocks in the living room. In fact, she testified that Defendant did not speak a great deal during the massage or afterward. Defendant's conduct may fairly be construed to indicate one continuous intent to unlawfully and intentionally touch or apply force to Jessica's intimate parts. Finally, with regard to the sixth *Herron* factor, there was only one victim during the course of conduct we are considering here.

{21} On the balance, we hold that the *Herron* factors support a finding of separate punishments for Defendant touching Jessica's breasts at some point during the one-hour massage, her vulva at the end of the massage, and her buttocks following the massage. In so doing, we note the similarity of this case and *Herron*, and we must distinguish this case from two recent cases in which CSCM convictions were set aside due to a double jeopardy violation based on a unit of prosecution theory. In *Ervin*, 2008–NMCA–016, ¶¶ 41, 47, 143 N.M. 493, 177 P.3d 1067, this Court recently decided that a full-body massage, from which three counts of CSCM were derived, violated double jeopardy. However, in *Ervin*, the state conceded the defendant's double jeopardy argument, the massage took place over a "short period of time," and there was no intervening event or movement or repositioning of the victim, distinguishing our case from *Ervin* despite the fact that in both cases the defendant touched three of the victim's body parts, there was only one victim, and there was but a single intent. *Id.* ¶¶ 45–46.

{22} In *Laguna*, 1999–NMCA–152, 128 N.M. 345, 992 P.2d 896, the defendant rubbed the victim's leg several times in a continual attempt to reach the victim's crotch area, and each time the victim pushed the defendant's hand away. *Id.* ¶ 38. Because this course of behavior occurred over a very short time period with no intervening event, the Court ruled that the repeated touching was "a single ongoing attempt to reach [the victim's] private parts." *Id.* The defendant also grabbed the victim's crotch, but both the record and the jury instructions were unclear as to what conduct constituted the two instances of CSCM charged by the state, and it was on this basis that the Court set aside one of the defendant's convictions. *Id.* ¶¶ 37, 39. *Laguna* is also distinguishable from our case. Jessica's massage lasted a full hour, there was at least one intervening event, and the record and jury instructions clearly distinguished each of the three counts of CSCM challenged by Defendant.

{23} We also distinguish this case from cases in which our appellate courts found double jeopardy violations by applying the *Herron* factors to nonsexual crimes, such as battery on a police officer, *State v. Ford*, 2007–NMCA–052, ¶¶ 13–16, 141 N.M. 512, 157 P.3d 77, resisting, evading, or obstructing an officer, *State v. LeFebre*, 2001–NMCA–009, ¶¶ 15–18, 130 N.M. 130, 19 P.3d 825, assault on a police officer, *State v. Handa*, 120 N.M. 38, 43–45, 897 P.2d 225, 230–32 (Ct.App.1995), and battery, *State v. Mares*, 112 N.M. 193, 199–200, 812 P.2d 1341, 1347–48 (Ct.App.1991). "In examining the indicia of distinctness, courts may inquire as to the interests protected by the criminal statute, since the ultimate goal is to determine whether the legislature intended multiple punishments." *State v. Bernal*, 2006–NMSC–050, ¶ 14, 140 N.M. 644, 146 P.3d 289.

{24} We hold that the interests protected by the CSCM statute deviate greatly from those protected by the statutes at issue in the above cases and that, accordingly, unit of prosecution analyses under the CSCM statute must be conducted with emphasis on the fourth *Herron* factor, the sequencing of the acts. "The legislatively-protected interests under the ... CSCM statute[ ] are aimed at protecting the bodily integrity and personal safety of children. [G]reat[ ] pain, embarrassment, psychological trauma, or humiliation may result from contact with intimate body parts as compared to contact with other parts of the body." *State v. Pierce*, 110

N.M. 76, 80–81, 792 P.2d 408, 412–13 (1990). In defining "intimate parts," the CSCM statute lists five separate protected areas: the genital area, groin, buttocks, anus, and breast. Section 30–9–13(A). Accordingly, "the legislative intent was to protect the victim from intrusions to each enumerated part." *State v. Williams*, 105 N.M. 214, 217, 730 P.2d 1196, 1199 (Ct.App.1986). Thus, under the facts of this case, which showed distinctly separate touchings of three of the protected areas, and in light of the foregoing discussion of the other *Herron* factors, we hold that Defendant was properly convicted and separately sentenced for each touching. *See id.*

### Admission of Testimony Concerning "Alpha State" Relaxation

■ {25} During the testimony of Thompson, the owner of the massage school attended by Defendant, she referred to "Alpha state," a brain wave pattern that she said occurs during sleep, relaxation, and meditation. She said that it was associated with REM sleep and a light hypnotic state. Defendant contends that this testimony should not have been admitted because it was invalid and unsound under the standards set forth for the admission of scientific testimony in *State v. Alberico*, 116 N.M. 156, 167–68, 861 P.2d 192, 203–04 (1993).

■ {26} "Admission of evidence is within the sound discretion of the trial court and the trial court's determination will not be disturbed in the absence of an abuse of that discretion." *State v. Aguayo*, 114 N.M. 124, 128, 835 P.2d 840, 844 (Ct.App.1992). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Woodward*, 121 N.M. 1, 4, 908 P.2d 231, 234 (1995) (internal quotation marks and citation omitted). Trial counsel did not object to this testimony. Because Defendant did not preserve this issue below, we review for fundamental error. *See State v. Lente*, 2005–NMCA–111, ¶ 12, 138 N.M. 312, 119 P.3d 737. "[T]he fundamental error doctrine is applied to review unpreserved error when the court's conscience is shocked at a miscarriage of justice, such as when a defendant is indisputably innocent or when a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *Id.* (internal quotation marks and citation omitted).

{27} Defendant contends neither that Thompson testified as an expert witness nor that Thompson's references to "Alpha state" were based on scientific knowledge. Accordingly, an *Alberico* analysis is not required of Thompson's lay testimony. Moreover, Defendant gives no reason why Thompson's use of the term "Alpha state" constituted fundamental error, nor does he explain why the court abused its discretion in admitting this testimony. We understand Thompson to have used the term "Alpha state" to refer to a state of deep relaxation, and she analogized it to the feeling that would result from meditation, daydreaming, or being "in the country relaxing." Thompson's analogies provided concrete examples to the jury of what she meant by the term. Moreover, she did not testify that either of the girls was in an "Alpha state" at any time, but merely testified that such a state was sometimes experienced by people being massaged. We conclude that the admission of this testimony was proper and did not constitute fundamental error.

### Admission of Videotaped Testimony

■ {28} Defendant further contends that a videotaped deposition of Jessica's mother was inadmissible evidence. The witness was slated to move to Saudi Arabia with her husband prior to trial, and due to limited visa restrictions, she would have only limited opportunities to return to the United States for the next two to three years. Following a hearing on the matter, the trial court ordered that a videotaped deposition would be taken in the courtroom and that the trial judge would be present to make rulings on objections as they occurred. The court noted that the jury would see a video that looked just like the witness was appearing before them in the courtroom. The video was played at trial over Defendant's objection. Defendant

contends that (1) the State did not comply with deposition notice requirements and (2) the deponent could conceivably have been present to testify at trial and was thus not an unavailable witness.

{29} We review the trial court's admission of the videotape for an abuse of discretion. *See Aguayo,* 114 N.M. at 128, 835 P.2d at 844. Defendant, however, makes no factual allegations that would support a determination that such an abuse occurred here. We are unpersuaded that the trial court acted in a manner that constituted an abuse of its discretion under the rules of evidence. Rule 11–804(A)(5) NMRA provides that a person is unavailable as a witness when she is absent from a hearing and the proponent of the witness's statement is unable to secure her attendance by process or other reasonable means. *See State v. Vialpando,* 93 N.M. 289, 295, 599 P.2d 1086, 1092 (Ct.App.1979) (noting that this rule is to be read with common sense and to ensure that due diligence is exerted to secure the witness's attendance at trial by means of process or other lawful means). Under our deferential review, we affirm the trial court's finding that the witness was unavailable pursuant to this rule.

{30} Moreover, the rules of evidence state that a deposition may be taken upon "order of the court at any time after the filing of the indictment or information or complaint in the district court, upon a showing that it is necessary to take the person's deposition to prevent injustice." Rule 5–503(B)(2) NMRA.

In accordance with this rule, we hold that the standard notice rules did not apply to the witness's court-ordered deposition and that the court did not abuse its discretion by ordering the deposition under the language of this rule. Finally, Defendant has not provided any reason why he was prejudiced by the use of a videotaped deposition of an unavailable witness, recorded with defense counsel present and the trial judge ruling on objections as they were raised. The deposition was scheduled for a time convenient for both counsel, and defense counsel was allowed to interview the witness prior to the taking of the deposition. We cannot say, based upon the rules of evidence, the situation presented to the trial court, and our deferential review of the admission of evidence, that the trial court abused its discretion.

## CONCLUSION

{31} We affirm.

{32} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE and CELIA FOY CASTILLO, Judges.