This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                          **No. 29,433**

**LOUIS ANTHONY DAPRANO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Mark A. Macaron and Albert S. "Pat" Murdoch, District Judges**

Gary K. King, Attorney General
Margaret E. McLean, Assistant Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

Jacqueline L. Cooper, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

Under a false name and with false credentials, Defendant Louis Anthony Daprano was hired as a psychologist at the Albuquerque Family and Child Guidance Center (the Counseling Center). During his term of employment, Defendant "counseled" a number of patients, some of whom were minors. After a jury trial, Defendant was convicted of forty-three counts of practicing psychology without a license, three counts of criminal sexual contact of a minor, and one count of attempted criminal sexual contact of a minor, among other crimes. We affirm.

**BACKGROUND**

In March 2004, Defendant (using the name Louis A. Gravina, Ph.D.) applied for a master's level psychologist position at the Counseling Center. With his application, Defendant submitted a curriculum vitae in which he listed his purported qualifications and certifications, including the assertion that his application for licensure with the New Mexico Board of Psychological Examiners was "in process." Having been hired by the Counseling Center, Defendant presented a letter to the Counseling Center, purportedly from the Department of Health (Defendant's letter), stating that he had previously passed a criminal history screening and that he did not need to be fingerprinted again.

On June 9, 2004, Dr. Nancy Grau, executive director of the Counseling Center, learned from two members of her staff that there was an issue as to the identity of

Defendant, at which point Dr. Grau instructed one of her staff to contact the Department of Health to verify the authenticity of Defendant's letter. On June 14, 2004, the Department of Health advised a Counseling Center staff member that Defendant's letter was fraudulent. As a result, the Counseling Center commenced an investigation into Defendant's background. As part of their investigation, Counseling Center staff contacted clients with whom Defendant had met, as well as the FBI, the Children, Youth, and Families Department, and the New Mexico Board of Psychologist Examiners.

On June 15, 2004, Felix Nuñez, an investigator with the Thirteenth Judicial District Attorney's Office, went to the Counseling Center, showed the staff a photo of Defendant and advised them that he was "a wanted sex offender." Mr. Nuñez had learned of Defendant's association with the Counseling Center through the execution of a June 11, 2004, search warrant at Defendant's residence. The warrant was related to an investigation of crimes in the Thirteenth Judicial District (the Sandoval County case). Having been charged in the Sandoval County case, Defendant presented his attorney with forged documents to be used to bolster his defense. The investigation revealed that, after the district court entered orders setting conditions of release, Defendant used various forged documents, including a false New Mexico driver's license and social security number, to obtain credit at the New Mexico Educator's

3

Federal Credit Union (the credit union), under the name and title of Reverend Louis Anthony Gravina, a Roman Catholic Priest. The investigation led to a federal case, in which Defendant ultimately pleaded guilty to bank fraud (the federal case). *See United States v. Daprano*, No. CR 04-2040 JB, 2011 WL 5220234, at *1 (D.N.M. Oct. 26, 2011).

On June 16, 2004, Mr. Nuñez executed a search warrant for the Counseling Center. Defendant had not been seen at the Counseling Center since June 11, on which date Dr. Grau had witnessed Defendant loading his belongings and supplies into his vehicle. Cooperation between the offices of the United States Marshals in Albuquerque, New Mexico and Albany, New York led to Defendant's arrest in New York on June 22, 2004. On August 23, 2004, Albany police executed a search warrant for Defendant's vehicle; the warrant was based, in part, on the June 11 warrant for Defendant's home. In the federal case, the United States conceded that the June 11, June 16, and August 23, 2004, search warrants lacked probable cause and were thus deficient. The federal court held, however, that Defendant had no standing to object to the search of his vehicle, which he had obtained through the fraudulent loan from the credit union, and that sources independent of the illegally obtained warrants to search Defendant's residence and his place of employment would inevitably have led investigators to discover the evidence of his crimes.

A grand jury indicted Defendant on the charges associated with the present case on October 22, 2004, and the indictment was filed on October 25, 2004. Due to several extensions, during which the parties awaited the outcome of the federal case, Defendant's trial did not commence until July 8, 2008. At a hearing on Defendant's motion to suppress the evidence obtained as a result of the illegal warrants, as discussed earlier, the district court adopted the federal court's findings of fact and conclusions of law, and denied Defendant's motion.

## II. DISCUSSION

On appeal, Defendant makes several arguments. He argues that his constitutional rights to a speedy trial and to be free from double jeopardy were violated. Additionally, he contends that all of the evidence against him should have been suppressed as a result of the illegal warrants. He also argues that there was insufficient evidence to support one of his convictions for criminal sexual contact of a minor. And finally, he contends that the district court's act of reading one of Defendant's prior statements aloud to the jury constituted fundamental error. We examine each of Defendant's arguments in turn, and finding no error, we affirm his convictions.

## A. Speedy Trial

Defendant argues that his constitutional right to a speedy trial was violated because his trial in this matter did not occur until forty-four months and two weeks after he was indicted. He claims that the delay was caused by the State and by his own counsel who stipulated to continuances and rule extensions against his wishes. He claims that the delay resulted in prejudice to his defense and to him personally.

To determine whether Defendant's constitutional right to a speedy trial was violated we must consider four factors: (1) length of the delay, (2) reasons for the delay, (3) whether Defendant asserted his right to a speedy trial, and (4) whether Defendant suffered any prejudice. *State v. Rojo*, 1999-NMSC-001, ¶ 49, 126 N.M. 438, 971 P.2d 829. "In considering each of the factors, we defer to the district court's factual findings but review de novo the question of whether [the d]efendant's constitutional right to a speedy trial was violated." *State v. Montoya*, 2011-NMCA-074, ¶ 9, 150 N.M. 415, 259 P.3d 820.

**1.     Length of Delay**

In order to provide guidance to the district courts in analyzing the length of delay, our Supreme Court, in *State v. Garza*, 2009-NMSC-038, ¶¶ 48-49, 146 N.M. 499, 212 P.3d 387, established benchmarks for determining when a delay in bringing a case to trial may become presumptively prejudicial. For cases of intermediate or greater complexity, the passage of fifteen to eighteen months may prompt a district

6

court to consider the three remaining speedy trial factors. *See id.* In this case, the district court found that at the time of Defendant's speedy trial motions hearing, the case had been pending for thirty-eight months and three weeks, thereby triggering a speedy trial analysis.

**2.      Reasons for the Delay**

Defendant contends that the reasons for the delay were attributable to his defense counsel, who agreed to rule extensions against his wishes and failed to actively represent him or to move the case along; the State's failure to make a good faith effort to bring him to trial; and the district court's failure to effectively manage its docket. Nevertheless, Defendant does not attack any of the district court's forty-one findings regarding the reasons for the delay, all of which led to the court's conclusion that "[i]n total, substantially less than [fifteen] months of the delay in this case is weighed against the State." The district court concluded that "[t]he majority of the delay . . . either weighed against . . . Defendant or occurred for valid reasons not weighed against either party. This factor does not weigh against the State." In the absence of any challenge to the district court's findings, we presume that they are correct. *See* Rule 12-213(A)(4) NMRA (stating that an appellant's brief "shall set forth a specific attack on any finding, or such finding shall be deemed conclusive"). Having been presented with no persuasive argument to the contrary, we conclude that

the district court did not err in determining that the "reasons for delay" factor weighed against Defendant.

**3.      Assertion of Speedy Trial Right**

Defendant asserted his right to a speedy trial four times, beginning in January 2005 and culminating in his September 2007 pro se motion alleging violation of his right to a speedy trial.  The district court found that the "assertion of right to speedy trial" factor weighed in Defendant's favor "but not heavily due to the other findings stated" in its order.  Although the court did not specify the particular "other findings[,]" the court's order noted numerous indications of Defendant's acquiescence to continuances, as well as Defendant's personal acknowledgment that it was in his best interest to await the outcome of the federal case before proceeding to trial in the district court.  Defendant argues, pursuant to *Zurla v. State*, 109 N.M. 640, 644, 789 P.2d 588, 592 (1990), that his early and forceful assertion of his right to a speedy trial causes this factor to weigh heavily in his favor.  Notwithstanding Defendant's assertions of the right, which the district court found to be "early and not often[,]" the effect of Defendant's own actions, as recited by the district court, cause this factor to weigh neutrally rather than in Defendant's favor.  *See Garza*, 2009-NMSC-038, ¶ 32 (stating that the frequency and force of the defendant's objections must be analyzed in conjunction with defendant's actions regarding the delay, and recognizing case law

8

that held the assertion-of-the-right factor weighs neutrally when the defendant engages in procedural maneuvers that result in delaying the trial).

**4.     Prejudice to Defendant**

The final factor of the speedy trial analysis, whether Defendant was prejudiced by the pretrial delay, is analyzed "in light of the interests that the speedy trial right is designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense would be impaired." *State v. Marquez*, 2001-NMCA-062, ¶ 23, 130 N.M. 651, 29 P.3d 1052.

Defendant broadly asserts that he was prejudiced by the delay and that the prejudice in this case "is obvious[,] as defense counsel told the court, [Defendant] lost his house, [his] car, and [his] personal belongings, and there was a loss of memory by the child witnesses." He further contends that he was extremely depressed and taking medication and that he "was anxious about his case during the almost four years of waiting to go to trial." Based on these assertions, Defendant states that the prejudice factor of the speedy trial analysis "unquestionably weighs in his favor."

The district court found that a lack of prejudice was implicit in this case because Defendant and his counsel made a tactical decision to await the outcome of the federal case before going to trial in the present case. As proof of Defendant's intention to

9

delay the trial, the district court referenced Defendant's own statements, as well as those of his counsel that showed an acquiescence on Defendant's behalf to delay trial until the federal case had been resolved. The court also enumerated the benefits to Defendant as follows:

> First, if a conviction were obtained in the state case, it could adversely affect the federal case. Second, by awaiting the [f]ederal [c]ourt's rulings on similar suppression issues involving the same warrants as the state case, . . . Defendant could benefit by suppression of evidence if the [s]tate [c]ourt were to consider the precedent of the U.S. [d]istrict [j]udge's decision and rule in a similar manner. Third, regardless of the U.S. [d]istrict [j]udge's decision[,] . . . Defendant would have the benefit of transcripts of testimony by the same witnesses who would later appear in the [s]tate [c]ourt and the legal briefs of counsel from the federal case. Fourth, (which occurred in this case) the State might concede the invalidity of certain warrants based upon the [f]ederal [c]ourt's decision. Also, delay of the state case until the federal case was ripe for resolution can be inferred as a tactic in this case which might give . . . [D]efendant leverage in plea negotiations. . . . The record indicates that [D]efendant's federal and state attorneys met and discussed with prosecutors the possibility of a plea agreement involving the federal and state cases.

Regarding Defendant's argument about anxiety and health concerns, the district court found that it was unclear "whether the anxiety and health concerns [were] due to the delay or [due to] his anticipation that he [would] be transferred to [s]tate custody" and noted that Defendant had indicated "that he must avoid state custody at all cost." Additionally, with regard to the child witnesses, the court found that Defendant acknowledged that he was unable to show prejudice by impairment of his defense

10

because some of the children had given safe house statements, and much of the witness testimony was preserved by transcripts in the federal case.

Defendant does not refute or otherwise address the district court's factual findings in regard to prejudice. *See* Rule 12-213(A)(4). Nor does his argument include any citation to the record. *See* Rule 12-213(A)(3) NMRA (stating that an appellant's brief "shall contain citations to the record proper, transcript of proceedings[,] or exhibits supporting each factual representation"); *Fahrbach v. Diamond Shamrock, Inc.*, 1996-NMSC-063, 122 N.M. 543, 551, 928 P.2d 269, 277 (stating that an appellate court "will not search the record to find evidence to support an appellant's claims" (internal quotation marks and citation omitted)). Moreover, "[a]n assertion of prejudice is not a showing of prejudice[,]" *Montoya*, 2011-NMCA-074, ¶ 13 (internal quotation marks and citation omitted), and here, Defendant's assertion that the prejudice "is obvious" is not a showing of prejudice. We are not persuaded by Defendant's argument, and we hold that the prejudice factor of the speedy trial analysis does not weigh in Defendant's favor.

Defendant's speedy trial rights were implicated by the passage of more than forty-four months between the indictment and his trial. The district court correctly found, given that Defendant heavily contributed to the delay, the "reasons for the delay" factor did not weigh against the State. Defendant's assertion of the right, when

viewed in the context of his own actions, caused the second speedy trial factor to weigh neutrally. And finally, Defendant has not shown that he was prejudiced by the delay. Based on the foregoing, we conclude that Defendant's right to a speedy trial was not violated.

**B.    Suppression**

Defendant contends that evidence obtained in violation of his right to be free from unlawful search and seizure under the Fourth Amendment to the United States Constitution and under Article II, Section 10 of the New Mexico Constitution should have been suppressed. The district court denied Defendant's motion to suppress based on its finding that the State's evidence would have been inevitably discovered by other sources and that there were independent sources of that evidence.

"The denial of a motion to suppress requires us to determine [whether] the law was correctly applied to the facts." *State v. Gutierrez*, 2005-NMCA-015, ¶ 9, 136 N.M. 779, 105 P.3d 332. On review, we defer to the factual findings of the district court, under a substantial evidence standard, *State v. Neal*, 2007-NMSC-043, ¶ 15, 142 N.M. 176, 164 P.3d 57, and we review de novo the legal question of whether constitutional standards were satisfied. *State v. Johnson*, 2006-NMSC-049, ¶ 9, 140 N.M. 653, 146 P.3d 298.

Defendant's argument broadly pertains to all of the evidence that was discovered through the search of his vehicle, his home, and the Counseling Center, and also pertains to the witness testimony. By asserting that there was "no entirely untainted information[,]" Defendant appears to argue that all of the evidence against him should have been suppressed as a result of the illegal warrant to search his home and, by extension, the warrants to search his vehicle and his office, which stemmed from the initial illegal search warrant. The State makes four arguments with regard to the evidence as it related to the unlawfully obtained warrants. Namely, that (1) Defendant failed to show that any of the victims' testimony or any of the exhibits were obtained by exploitation of the searches and that, in particular, the victims' testimony was not linked with the illegal searches; (2) the testimony of the victims and their parents, the public records, and the records of the Counseling Center were independent sources of information, unrelated to any illegal police activity; (3) evidence in this case would inevitably have been discovered as a result of the Counseling Center's own investigation; and (4) Defendant lacked standing to object to a search of the Counseling Center. Since the record reflects that in the district court the State focused on the inevitable-discovery and independent-source doctrines, and because the district court based its holding on those doctrines, we limit our discussion to those arguments.

Although Defendant references Fourth Amendment jurisprudence, he acknowledges that it does not weigh in his favor and therefore requests that this Court analyze the suppression issue under the State Constitution. *See, e.g.*, *State v. Wagoner*, 2001-NMCA-014, ¶ 28, 130 N.M. 274, 24 P.3d 306 (stating that United States Supreme Court case law applying the independent-source doctrine "teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position than they would have been in if no police error or misconduct had occurred." (emphasis in original) (alteration, internal quotation marks, and citation omitted)).

Defendant's argument is based primarily on *Wagoner*. In that case, an officer, acting pursuant to a tip from a citizen informant that a residence could be the location of drug dealing, requested but was denied consent by the defendant to search the house. *Id.* ¶ 2. The officer conducted a warrantless sweep of the home, during which he observed drugs and drug paraphernalia in plain view. *Id.* In applying for a warrant, the officer included information about the contraband that he had observed during the sweep. *Id.* The district court granted the defendant's suppression motion based on its conclusion that the warrantless sweep was not justified by exigent circumstances. *Id.* ¶ 3. This Court agreed with the district court's conclusion

14

regarding the sweep, but remanded on the issue of whether the evidence should have been admitted under the inevitable-discovery doctrine, which applies "where evidence may have been seized illegally, but where an alternative legal means of discovery, such as a routine police inventory search, would inevitably have led to the same result." *Id.* ¶¶ 3, 15. On remand, the district court denied the defendant's suppression motion under the inevitable-discovery doctrine because it found that the officers intended to secure a warrant prior to the illegal entry and that the magistrate would have issued the warrant regardless of the illegally obtained information. *Id.* ¶ 6. The defendant appealed. *Id.* ¶ 1. This Court reversed, holding that "a search conducted pursuant to a warrant based partially on tainted information gathered during a prior illegal search is not an independent source of the evidence seized and therefore must be suppressed." *Id.* ¶ 40. Defendant contends that his case is factually similar to *Wagoner* because the police used evidence obtained during an unlawful search of his home to persuade a magistrate to issue a search warrant for his place of employment.

Unlike *Wagoner*, in which the contraband was discovered after an illegal police entry and then used to secure a warrant, here, Defendant's fraud had been discovered by the Counseling Center and reported to various authorities, including the FBI, prior to the search of his office at the Counseling Center and prior to the Counseling Center staff being notified by Mr. Nuñez or by police of Defendant's suspected fraud.

15

Moreover, the Counseling Center had already started its own investigation by contacting clients and their parents to report their discovery and to request information as to the clients' experiences in their sessions with Defendant. Thus, any evidence that stemmed from the illegal searches would inevitably have been discovered as the Counseling Center continued its course of investigation. *See id.* ¶ 15 (stating that for the inevitable-discovery doctrine to apply, "the alternate source of evidence must be pending, but not yet realized"). The district court did not err in holding that the inevitable-discovery doctrine applied to these facts.

In addition to inevitable discovery, the State also argues that the witness testimony, which included the testimony of victims and their parents, were independent sources of evidence concerning what happened to them. As well, the State contends that the public records and the records of the Counseling Center were independent sources of evidence. The independent-source doctrine applies where the evidence was obtained independent of the tainted or possibly tainted information. *Id.* ¶ 13. Under this doctrine, "[t]he applicable inquiry is whether the evidence would not have come to light 'but for' the illegality." *State v. Gurule*, 2011-NMCA-063, ¶¶ 25-26, 150 N.M. 49, 256 P.3d 992, *cert. granted*, 2011-NMCERT-006, 150 N.M. 764, 266 P.3d 633. Because the inquiry requires an inference of what might have occurred, we defer to the district court's factual findings. *Id.* ¶ 26. Here, the record supports the

16

district court's finding that the information would have come to light by inevitable discovery and through independent sources regardless of the illegal searches. Defendant does not attack this finding by the district court, nor does he refute the State's argument that the information would have come to light notwithstanding the illegal search. In sum, there is nothing to suggest that "but for" the illegal search of Defendant's home or place of employment, the victims, their parents, the Counseling Center documents, and the public records regarding Defendant's lack of a license to practice psychology would not have come to light. *See id.* ¶¶ 25-26 (affirming the district court's exclusion of a witness's testimony because the district court reasonably inferred that "but for" an officer's illegal seizure of evidence, the witness would not have testified). The evidence was properly admitted at Defendant's trial under both the inevitable-discovery and independent-source doctrines.

**C.    Double Jeopardy**

**1.    Multiple Counts of Practicing Psychology Without a License**

Defendant argues that the forty-three counts of practicing psychology without a license should have been charged as one course of conduct resulting in only one conviction for the "ongoing act" of working as a psychologist at the Counseling Center. Alternatively, Defendant argues that, at most, he should have been charged with only fifteen counts—one for each client. Defendant's statutory construction

17

argument presents a question of law, which we review de novo. *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995).

"A statute should be construed so that no part of it is rendered surplusage or superfluous." *State v. Dunsmore*, 119 N.M. 431, 433, 891 P.2d 572, 574 (Ct. App. 1995). "The main goal of statutory construction is to give effect to the intent of the [L]egislature." *Rowell*, 121 N.M. at 114, 908 P.2d at 1382. "The words of a statute . . . should be given their ordinary meaning, absent clear and express legislative intention to the contrary, but our construction must not render the statute's application absurd, unreasonable, or unjust[.]" *Id.* (omission in original) (internal quotation marks and citations omitted).

The pertinent statute, NMSA 1978, § 61-9-14 (1993), provides that:

A.    It is a misdemeanor:

    (1)    for any person not licensed under the Professional Psychologist Act . . . to practice psychology or to represent himself as a psychologist or a psychologist associate;

    . . . .

B.    Such misdemeanor shall be punishable upon conviction by imprisonment for not more than three months or by a fine of not more than one thousand dollars . . . or by both such fine and imprisonment. Each violation shall be deemed a separate offense.

NMSA 1978, Section 61-9-3(H) (2002) defines the phrase "practice of psychology" as follows:

"practice of psychology" means the observation, description, evaluation, interpretation[,] and modification of human behavior by the application of psychological principles, methods[,] and procedures for the purpose of preventing or eliminating symptomatic, maladaptive[,] or undesired behavior and of enhancing interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health and mental health, and further means the rendering of such psychological services to individuals, families[,] or groups regardless of whether payment is received for services rendered. The practice of psychology includes psychological testing or neuropsychological testing and the evaluation or assessment of personal characteristics such as intelligence, personality, abilities, interests, aptitudes[,] and neuropsychological functioning; counseling, psychoanalysis, psychotherapy, hypnosis, biofeedback, behavior analysis[,] and therapy; diagnosis and treatment of any mental and emotional disorder or disability, alcoholism and substance abuse, disorders of habit or conduct[,] and the psychological aspects of physical illness, accident, injury[,] and disability; and psychoeducational evaluation, therapy, remediation[,] and consultation[.]

In unit-of-prosecution cases, our Supreme Court has provided a two-step analysis: "First, we review the statutory language for guidance on the unit of prosecution. If the statutory language spells out the unit of prosecution, then we follow the language, and the unit-of-prosecution inquiry is complete." *State v. Gallegos*, 2011-NMSC-027, ¶ 31, 149 N.M. 704, 254 P.3d 655 (internal quotation marks and citations omitted). Here, the statutory language spells out the unit of prosecution by declaring that "[e]ach violation shall be deemed a separate offense." Section 61-9-14(B). Relying on the definition provided by Section 61-9-3(H), the State argues that Defendant rendered psychological services each time he met with one of his "clients." We agree. Defendant's progress notes from each of the "counseling sessions," which were

19

exhibits at trial, indicated that Defendant was providing the service of "individual therapy" to the clients—the very act prohibited by Section 61-9-14 and described by Section 61-9-3(H). *See State v. House*, 2001-NMCA-011, ¶ 19, 130 N.M. 418, 25 P.3d 257 ("[A] charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once." (internal quotation marks and citation omitted)). Because the statutory language spells out the unit of prosecution, our inquiry is complete. Defendant was properly charged with one violation of the statute for each "counseling session" he held with each of the clients.

We are unpersuaded by Defendant's attempt to analogize this case to *State v. Edwards*, 102 N.M. 413, 696 P.2d 1006 (Ct. App. 1984). In *Edwards*, this Court analyzed the unit of prosecution under the unauthorized practice of law statute, NMSA 1953, § 36-2-28 (1925) (repealed by 2011 N.M. Laws, ch. 107, § 3) (current versions at NMSA 1978, §§ 36-2-28.1, -28.2 (2011)). *Edwards*, 102 N.M. at 415-16, 696 P.2d at 1008-09. Unlike Section 61-9-14, Section 36-2-28 did not spell out the unit of prosecution. *See Edwards*, 102 N.M. at 416, 696 P.2d at 1009 ("If any person shall, without having become duly licensed to practice, or whose licenses to practice shall have expired either by disbarment, failure to pay his license fee or otherwise, practice or assume to act or hold himself out to the public as a person qualified to practice or

20

carry on the calling of a lawyer, he shall be guilty of an offense . . . and on conviction thereof be fined not to exceed five hundred dollars . . . or be imprisoned, for a period not to exceed six months, or both." (internal quotation marks and citation omitted)). Therefore, the *Edwards* analysis differs from that in the present case where we are able to follow the statutory language to complete our unit-of-prosecution inquiry. *See Gallegos*, 2011-NMSC-027, ¶ 31 ("If the statutory language spells out the unit of prosecution, then we follow the language, and the unit-of-prosecution inquiry is complete.").

**2.      Multiple Counts of Criminal Sexual Contact of a Minor**

Defendant claims that his right to be free from double jeopardy was violated with respect to two of his victims, E.G. and C.L., in that in each instance he was subjected to multiple punishments for one offense. "Because there are no disputed material facts, we review Defendant's double jeopardy challenge using a de novo standard of review." *State v. Haskins*, 2008-NMCA-086, ¶ 15, 144 N.M. 287, 186 P.3d 916.

Defendant was convicted of criminal sexual contact of a minor for touching E.G.'s breasts and for attempted criminal sexual contact of a minor for intending and beginning the act of touching E.G.'s buttocks and/or genital area. Evidence presented at trial indicated that, during a "counseling session," E.G. told Defendant that what he

21

disliked about himself was that he was "fat" or "chubby." In response, Defendant instructed E.G. to stand in front of a mirror and to take off his shirt. E.G. having done so, Defendant "put his hand around [E.G.'s] waist, mostly rubbing it. And he kept trying to touch [E.G.'s] arm, as if he was enjoying it[.]" He then asked E.G. to take off his pants. E.G. refused, but Defendant "kept repeating himself[.]" E.G. repeatedly said "no" and also stated that he was "uncomfortable about it." Defendant then threatened E.G. by saying that if he did not take off his pants, he would have the police escort E.G. out of the Counseling Center, take him to jail, and have E.G.'s mother punish him. E.G. testified that he "was afraid" and "[did not] know what to do." Following Defendant's threat, E.G. took off his pants. Defendant then started touching "all around" E.G.'s legs and putting his hand, "his thumb mostly," under E.G.'s underwear. When Defendant asked E.G. to take off his underwear, E.G. "panicked" and pulled up his pants, then asked if he could go get a drink of water. At trial, the district court agreed with the State that Defendant's act of massaging and fondling E.G.'s breasts, including his nipples was a separate and distinct act from Defendant's attempt, after having caused E.G. to remove his pants, to fondle E.G.'s buttocks or genital area.

On appeal, Defendant argues that under the *Herron* factors, the touching of E.G. was one continuous act of criminal sexual contact with a minor. *See Herron v. State*,

22

111 N.M. 357, 361, 805 P.2d 624, 628 (1991) (describing the six factors used in a unit-of-prosecution analysis). We determine that the *Herron* factors support Defendant's separate convictions related to E.G. The first factor is the "temporal proximity of the acts[.]" *Haskins*, 2008-NMCA-086, ¶ 18. Under this factor, "the greater the interval between the acts the greater likelihood of separate offenses." *Id.* Here, Defendant's act of touching E.G.'s breasts and arm was separated by the length of time during which Defendant coaxed E.G. into removing his pants first by repeatedly asking him to do so and eventually culminating in the threat of arrest and parental punishment. *Cf. id.* (holding that the defendant's three separate acts of touching the victim's breasts, vulva, and various parts of her body during a one-hour massage were sufficiently separate in time to be considered separate offenses). The second factor, "the location of the victim during each act and whether there was movement or repositioning of the victim," *id.* ¶ 17, weighs in Defendant's favor because there was no evidence that the acts of touching E.G. took place anywhere but in front of the mirror in Defendant's office. The third factor, "the existence of an intervening event," *id.*, weighs in favor of multiple punishments because, between the first and second acts of touching, Defendant and E.G. had a discussion, as described in the first-factor analysis, and E.G. took off his pants. *See id.* ¶ 19 (holding that there was an intervening event between two acts of touching because the victim got dressed

23

and went to a different room between the two acts). For analysis of the fourth factor, "the sequencing of the acts," *id.* ¶ 17, "we analogize to the criminal sexual penetration context, in which serial penetrations of different orifices, as opposed to repeated penetrations of the same orifice, tend to establish separate offenses[.]" *Id.* ¶ 19. The fact that E.G. was touched on different parts of his body weighs heavily in favor of separate offenses. *See id.* The fifth factor, Defendant's "intent as evidenced by his conduct and utterances," *Haskins*, 2008-NMCA-086, ¶ 17, weighs in Defendant's favor because Defendant's "conduct may fairly be construed to indicate one continuous intent to unlawfully and intentionally touch or apply force to [E.G.'s] intimate parts." *Id.* ¶ 20. The sixth *Herron* factor, "the number of victims[,]" *id.* ¶ 17, weighs neutrally because E.G. was the only victim in that particular "counseling session." With three of the five applicable *Herron* factors weighing in favor of separate offenses, we hold that Defendant's double jeopardy rights were not violated by the criminal sexual contact and attempted criminal sexual contact of E.G.

In regard to C.L., Defendant argues that his separate convictions for touching C.L's testicles and penis constituted double jeopardy. Evidence at trial showed that in a "counseling session" with C.L., Defendant told C.L. that he was a doctor and asked C.L. to pull down his pants so Defendant could check him for a hernia. When, after some resistance, C.L. complied, Defendant "started putting his hand [through

24

the] little hole in [C.L.'s underwear], grabbed [C.L.'s] ball," and told him to turn to the right and cough.  C.L. turned his head left and right and coughed, and Defendant told him that he did not have a hernia and that he was "real healthy."  Defendant then pulled C.L.'s foreskin back and "looked around it" and "started moving through [C.L.'s] hair[,] and looking[.]"

Having, in an earlier paragraph, set out the *Herron* factors in some detail, we summarily address the same factors with regard to the C.L. related convictions.  First, the act of touching C.L.'s testicle and the act of touching his penis were separated in time by Defendant's having conveyed his assessment that C.L. was healthy and did not have a hernia.  Second, as with E.G., there was no evidence that the touching of C.L. occurred in more than one location, and thus, the location factor weighs in favor of Defendant.  Third, the intervening event between the two acts of touching was Defendant's communicating to C.L. that he was healthy and did not have a hernia.  With the "hernia check" completed, Defendant commenced the next touching, which was the act of retracting C.L.'s foreskin.  We hold that this factor weighs in favor of separate offenses. *See Haskins*, 2008-NMCA-086, ¶ 19 (holding that the third *Herron* factor weighed in favor of multiple punishments where the only evidence of intervening events between the defendant having touched two of the victim's intimate parts was "finishing the rest of the massage" (alteration omitted)).  Fourth, as

discussed in regard to E.G., the fact that Defendant touched two different parts of C.L.'s body weighs heavily in favor of separate offenses. *See id.* Fifth, the evidence indicates that Defendant's intent was to engage in a continuous course of conduct, and thus, weighs against separate offenses. *See id.* ¶¶ 17, 20. Because there was only one victim at this "counseling session" the sixth factor is inapplicable. Thus, with regard to C.L., with three *Herron* factors weighing in favor of separate offenses, including the fourth factor which weighs heavily in favor of such, we conclude that Defendant was not put twice in jeopardy for the same offense.

**E.     Sufficiency of the Evidence**

In regard to E.G., Defendant argues that the State failed to prove that he committed criminal sexual contact of a minor by touching E.G.'s unclothed breasts, including his chest and nipples. Defendant's argument is based on his contention that a male "chest" is not an "intimate part" because there is "an anatomical difference between male and female breasts[.]" Defendant's argument raises an issue of statutory construction, which is a matter of law that we review de novo. *Rowell*, 121 N.M. at 114, 908 P.2d at 1382.

NMSA 1978, Section 30-9-13(A) (2003) reads:

> [c]riminal sexual contact of a minor is the unlawful and intentional touching of or applying force to the intimate parts of a minor or the unlawful and intentional causing of a minor to touch one's intimate parts.

26

For the purposes of this section, "intimate parts" means the primary genital area, groin, buttocks, anus[,] or breast.

Nothing in Section 30-9-13(A) suggests that the Legislature intended to distinguish the intimate parts of a male child from the intimate parts of a female child, and "[w]e will not read into a statute language which is not there, especially when it makes sense as it is written." *State v. Hubble*, 2009-NMSC-014, ¶ 10, 146 N.M. 70, 206 P.3d 579. To the contrary, the Legislature's use of the phrase "intimate parts of a minor" indicates a legislative intent to include any minor.

Defendant's reliance on *City of Albuquerque v. Sachs*, 2004-NMCA-065, 135 N.M. 578, 92 P.3d 24, in this context is misplaced. This Court's holding in *Sachs* addressed an issue of adult public nudity and has no application in the realm of criminal sexual contact. *See id.* ¶ 1 (examining the question of whether a city ordinance which prohibits public nudity discriminated against women in violation of the Equal Rights Amendment in the New Mexico Constitution because it prohibits a woman from showing her nude breast in a public place when there was no such prohibition against a man). Defendant does not provide any authority to support a distinction, between the "intimate parts" of a male or a female in a criminal sexual contact of a minor case, nor would such a distinction be appropriate. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) ("We assume

27

where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority.").

**F.      Remarks by the District Court**

Following the presentation of the State's evidence, the district court read the following statement, which Defendant had himself stated to the court during a pretrial hearing: "They're talking about an investigation that happened at the Albuquerque Family and Child Guidance Center. They were investigating Louis Gravina. Certainly they found bogus information about Louis Gravina because it was a persona that I created." The court then dismissed the jury for an afternoon recess. Defendant, who did not object to the court's reading the statement, asserts on appeal that as a result of the court having read the statement, Defendant was denied due process and a fair trial. He requests that we review this issue for fundamental error.

Fundamental error applies "to prevent a miscarriage of justice, . . . if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand." *State v. Gomez*, 2001-NMCA-080, ¶ 21, 131 N.M. 118, 33 P.3d 669 (omission in original) (alteration, internal quotation marks, and citation omitted). Defendant does not argue that his statement was improperly admitted against him. Rather, he argues that the court's "comment interfered with [the] role of the jury as

28

independent fact-finder" because it "conveyed to the jury that [the court] believed [Defendant] was guilty[.]" We disagree.

Unlike cases in which this Court and our Supreme Court have concluded that a district court's comment was improper, the district court in this case did not comment on Defendant's credibility. *See State v. Henderson*, 1998-NMSC-018, ¶¶ 14, 17, 125 N.M. 434, 963 P.2d 511 (holding that the district court had improperly commented on the witness's credibility before the jury by referring to the witness as "the 'guy who wanted to get drunk and get laid'"); *Gomez*, 2001-NMCA-080, ¶¶ 19, 22 (explaining that the district court's comments had been on the "brink of fundamental error" when a taped interview was played for the jury in which the district court complemented a child witness by stating "[y]ou did very well and we're all very proud of you, that you came here and you told us the truth"); *State v. Sanchez*, 112 N.M. 59, 65-66, 811 P.2d 92, 98-99 (Ct. App. 1991) (holding that the district court had commented on the evidence, when in the presence of the jury, after a witness's testimony, it stated that, based on the witness's testimony, it would find that the witness was "unavailable" based on a lack of memory and stating to the jury that the witness's testimony was "worthless"). Rather than conveying the court's opinion "concerning the weight of the evidence or the credibility of a witness[,]" *Sanchez*, 112 N.M. at 66, 811 P.2d at 99, here, the statement was a verbatim quote of a an earlier

statement made by Defendant. There was no error, much less fundamental error, in the court's having presented Defendant's own statement to the jury, without conveying its own opinion. *Cf. id.* ("Generally, remarks made by a trial judge in ruling upon a motion before the court in a jury trial do not constitute error if they do not amount to a comment concerning the weight of the evidence or the credibility of a witness.").

**G.    Sentencing**

Defendant raised an issue in his brief in chief related to the legality of his sentence, contending that in 2004, when the crimes were committed, the penalty for criminal sexual contact of a minor was nine years imprisonment, however, he concedes in his reply brief that, in 2003 the penalty was changed to fifteen years. We deem that Defendant has conceded the correctness of the district court's application of the fifteen-year sentence provision under NMSA 1978, Section 31-18-15(A)(3) (2003) (amended 2005 and 2007) (current version at Section 31-18-15(A)(5)), and, therefore, we do not examine the argument further.

**II.    CONCLUSION**

For the foregoing reasons, we affirm Defendant's convictions.

**IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Judge**

_____
**J. MILES HANISEE, Judge**